# Exhibit "A"

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Robert P. Zoller, Esq., Attorney ID #011591982
Christopher E. Torkelson, Esq., Attorney ID #022961996
Karlee M. Martin, Esq., Attorney ID #240742018
*Physical Address:* 2000 Lenox Drive, Suite 203, Lawrenceville, NJ 08648
*Mailing Address:* P.O. Box 5404, Princeton, NJ 08543
Telephone:   (609) 392-2100
Facsimile:    (609) 392-7956
*Attorneys for Plaintiff, Joseph Jingoli & Son, Inc.*

**FILED**

October 16, 2023

**SUPERIOR COURT OF NJ
MERCER VICINAGE
CHANCERY**

| | |
|---|---|
| JOSEPH JINGOLI & SON, INC.<br><br>Plaintiff,<br><br>v.<br><br>ERICA L. BEAL,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>MERCER COUNTY<br>DOCKET NO.: ____C-70-23____<br><br>CIVIL ACTION<br><br>**VERIFIED COMPLAINT** |

Plaintiff, Joseph Jingoli & Son, Inc. ("Jingoli"), by and through its counsel, Eckert Seamans Cherin & Mellott, LLC, by way of Verified Complaint against defendant, Erica L. Beal ("Beal"), states as follows:

## PARTIES

1.   Jingoli is a corporation that maintains its principal place of business at 100 Lenox Dr #100, Lawrence Township, New Jersey 08648.

2.   Beal is an individual residing in the State of California.

## FACTUAL ALLEGATIONS

### Joseph Jingoli & Son, Inc. and Jingoli Power, LLC

3.   Jingoli is engaged in business within the fields of power/energy, economic development, healthcare, gaming, education, and industrial/manufacturing sectors.

4.    Jingoli is the parent company of Jingoli Power, LLC ("JPOW"), a New Jersey limited liability company that assists clients with complex electrical transmission, distribution/substation projects, and programs.

5.    In addition to JPOW, Jingoli is an affiliate of various other companies specializing in the energy development sector, including but not limited to DOC Energy, LLC, JET Electrical Testing, Goldstar Energy Group, Inc., JBM Energy Solutions, and EID Solutions. (collectively, "Affiliate Companies").

6.    Karl Miller ("Miller") is JPOW's Chief Executive Officer. Miller is neither an employee nor an executive of Jingoli.

7.    The nature of Jingoli's business, JPOW's business, and the Affiliate Companies' business is highly competitive.

**Arbitration Proceeding between JPOW and Beal regarding AVIVV, LLC**

8.    On or about September 10, 2019, JPOW and Beal formed AVIVV, LLC ("AVIVV"), a two member New Jersey limited liability company. Beal is a majority member of AVIVV (having a 51% interest in AVIVV) and JPOW is a minority member (having a 49% interest in AVIVV).  (See Operating Agreement of AVIVV attached as Exhibit "A").

9.    AVIVV was formed by JPOW and Beal to provide project execution services for private and public utility projects, specifically electric transmission, substation, and distribution projects. (See Exhibit "A" at Article 3.1).

10.   Beal has breached her fiduciary duties to AVIVV by conducting self-serving activities that are contrary to the best interests of the AVIVV, and demanding cash distributions from AVIVV without any regard to the terms of the Operating Agreement.

2

11.     Beal's breaches have caused AVIVV and JPOW considerable harm, including but not limited to lost profits, loss of opportunity, loss of good will, conflicts of interest and employment risk exposure.

12.     In accordance with the AVIVV Operating Agreement, on June 16, 2023, JPOW filed a Demand for Arbitration supported by a Statement of Claim against Beal before the American Arbitration Association to resolve Beal's breaches of the AVIVV Operating Agreement. The arbitration proceeding is pending under AAA Case 01-23-0002-7129. JPOW seeks to settle distributions to be made under the AVIVV Operating Agreement, wind down the affairs of AVIVV, and dissolve AVIVV. (See Arbitration Demand and Statement of Claim attached as Exhibit "B")

**Beal's Conduct Following JPOW's Initiation of Arbitration**

13.     After the filing of the AVIVV arbitration, in an effort to bolster her position in the arbitration, Beal engaged in further self-serving conduct, and began making false, misleading and unsubstantiated claims against Jingoli and JPOW executives, including but not limited to JPOW's CEO, Karl Miller.

14.     Specifically, on June 27, 2023, Beal sent correspondence to Jingoli and JPOW executives, making scurrilous claims of bullying, retaliation, fraud, discrimination, victimization, harassment, threats, coercion and debt bondage. Beal also sent a copy of the correspondence to third parties and governmental entities, including the Military Chamber of Commerce, the Women's Business Enterprise Counsel, the California Public Utilities Commission, and the Western Regional Minority Supplier Development Council. (See Beal's June 27, 2023 correspondence attached as Exhibit "C").

15.     On June 28, 2023, JPOW responded to Beal's June 27, 2023 correspondence, and stated, amongst other things, that her allegations of bullying, retaliation, fraud, discrimination, sexual harassment, victimization, harassment, threats, coercion and debt bondage are patently false. JPOW's correspondence reads, in part:

> Erica,
> . . .
> Your unsubstantiated and outlandish allegations of bullying, retaliation, fraud, discrimination, sexual harassment, victimization, harassment, threats, coercion and debt bondage are untrue and categorically denied. We have kept every e-mail and text communication between you and JPOW officers and they are consistently full of gratitude for JPOW's efforts in assisting you and helping develop AVIVV. We have also checked with AVIVV's HR department, and it has never received any complaints from you regarding the egregious and false allegations that you are now advancing. To the contrary, the personal text you sent me on February 7, 2023 is more indicative of the true state of affairs. It is apparent that your recent false and egregious allegations are being advanced as a misguided negotiating tool. In case you have forgotten, here is what you texted me on February 7, 2023:
>
> "I just want to say thank you for everything. You really taught me a lot and I am appreciative of the experience. I know we are working through the process to finalize everything and ensure a smooth transition."
> . . .

> (See JPOW's June 28, 2023 correspondence attached as Exhibit "D").

16.     On June 29, 2023, counsel for JPOW sent correspondence to Beal's counsel, Mark-Robert Bluemel, Esq., demanding that Beal cease and desist from making further defamatory comments. (See June 29, 2023 correspondence attached as Exhibit "E").

17.     That same day, Beal sent another correspondence to Jingoli and JPOW executives, and again copied third parties and governmental entities. Therein, Beal reiterated her baseless, slanderous and defamatory comments about JPOW and Jingoli executives. (See Beal's June 29, 2023 correspondence attached as Exhibit "F").

18.     On June 30, 2023, JPOW responded to Beal's June 29, 2023 correspondence, and again addressed her defamatory claims. JPOW's correspondence reads, in part:

Erica,

We have received scores of written communications from you expressing your gratitude for the support and mentoring JPOW officers have provided to you in establishing AVIVV and developing the business. All these communications will be shared during Arbitration. In fact, the partnership was going well until in 2022 you breached your fiduciary responsibilities by forming competing companies, using AVIVV resources to do so and then denying it. Nevertheless, you continued to draw $45,000 a month out of the Company, despite doing little or no work for the company and certainly no business development, as those efforts were focused on your other entities. JPOW even acquiesced to keeping your mother on the payroll for business development services in Texas where she lives at an annual salary of $70,000 plus benefits and a new car, despite she was not providing any meaningful services to the Company. Although [you] never created any business development opportunities during the thirteen months of her employment, all [your] costs were paid while she worked for AVIVV.

Your allegations of exploitation couldn't be further from the truth.

(See JPOW June 30, 2023 correspondence attached as Exhibit "G").

19.     On July 6, 2023, Beal filed a grievance with the New Jersey District Ethics Committee against JPOW's counsel, Robert P. Zoller, Esq., alleging a conflict of interest. The grievance was summarily dismissed by the District Ethics Committee.

20.     On August 8, 2023, Beal filed a request for a civil Temporary Restraining Order ("TRO") against Karl Miller (JPOW's Chief Executive Officer) with the Superior Court of California, County of San Diego, Case No. 37-2023-00033655-CU-HR-CTL. A Hearing was initially scheduled for August 31, 2023, but later postponed to October 23, 2023. (See TRO attached as Exhibit "H").

21.     Among other baseless assertions, Beal alleged that on March 27, 2023 "[a]t a public hearing, Karl Miller became hostile and agitated towards me. He threatened and intimidated me and saying [sic] 'You backstabbing, greedy, Bitch. I will hurt you.'" (See TRO attached as Exhibit "H").

22.     On March 27, 2023—the same date which Beal alleges Miller said the above comment—Beal texted Miller and said "Excellent job last week! If you ever need any speakers/mentors for competitive edge, Jeremy is always willing to help. We are advocates." (See March 27, 2023 text message attached as Exhibit "I").

23.     Not satisfied with having filed her scurrilous and defamatory request for a TRO against Karl Miller in California, on September 15, 2023, Beal went further and filed a lawsuit against JPOW, Karl Miller, and Eckert Seamans Cherin & Mellott, LLC, in the Superior Court of the State of California, County of San Diego, Central District. In that lawsuit, Beal asserts claims against JPOW and Miller for sexual harassment, failure to prevent sexual harassment, negligent supervision, unlawful retaliation, intentional infliction of emotional distress, sexual battery, sexual assault, fraud and breach of contract. (See Beal's California Complaint attached as Exhibit "J").

24.     Beal's California Complaint relies and expands upon her defamatory statements made in her request for a TRO and contains numerous false allegations. For instance, Beal asserts that in March of 2021, Miller threatened her by saying "Your partners are from New Jersey, and it is no problem making a body disappear. We are the only ones to trust and remember it's my word against yours." (See Exhibit "J" at ¶ 38).

25.     At the exact same time, in March of 2021, Beal texted Miller and stated "I want to ask if I can mention you as my mentor in a magazine publication. There is a whole section about mentoring and You. It's in draft mode still." (See Beal's March 24, 2021 text message attached as Exhibit "K").

26.     Beal also falsely asserts in her California Complaint that on June 30, 2021, Miller made comments about another woman that made Beal uncomfortable. (See Exhibit "J" at ¶ 41).

27.     However, on July 8, 2021, Beal sent Miller unsolicited pictures celebrating her weight loss, to which Miller responded "Nice. Congrats." (See Beal's July 8, 2021 text message attached as Exhibit "L").

28.     Beal also falsely asserts that on July 28, 2021, Miller called her and told her "You are not an engineer or a man. You don't know what the fuck you are doing? Your job is to sell and leave everything up to us." (See Exhibit "J" at ¶ 42).

29.     However, six weeks later, on September 15, 2021, Beal texted Miller regarding his mother's illness and said "Thinking of you. We are praying for Your family. God Bless." She further stated "Karl, you are special." (See Beal's September 15, 2021 text message attached as Exhibit "M").

30.     Beal continued to send text messages to Miller throughout the duration of 2021 and 2022. These messages state, among other things: (1) Beal thinks Miller has a genuine heart; (2) Miller is Beal's friend and partner; (3) Beal's mother loves Miller; (4) Beal's Thanksgiving wishes to Miller; (5) Beal's desire to send Miller a Christmas gift; and (6) Beal's request for Miller be a mentor to AVIVV employees. (See Beal and Miller's text messages attached as Exhibit "N").

31.     Beal's claims against Miller, as asserted in her request for a TRO, and the claims against Miller and JPOW, as asserted in her California Complaint, are patently false, unsubstantiated and defamatory.

**Beal's Tortious and Defamatory Conduct Directed to Jingoli in New Jersey**

32.     On October 7, 2023, Beal sent two e-mails to clients and/or business partners of Jingoli, including Devco, a long-standing client of Jingoli's in New Jersey, and the IBEW, a national union that partners with Jingoli on various construction projects, from an anonymous e-mail address (justice4womenofcolor@gmail.com). The first email was entitled ""Billion Dollar

NJ Contractor exploits Diversity & Inclusion Program" and attached Beal's California Complaint. The second e-mail was entitled "Part 2 – Additional Proof – IMMEDIATE SAFETY CONCERN" and attached the TRO (See October 7, 2023 E-mails attached as Exhibit "O").

33.    At the time Beal sent the October 7, 2023 E-mails to Jingoli's clients and business partners in New Jersey, Beal knew the California Complaint and TRO contained false and defamatory statements, and she nevertheless sent those attachments in reckless disregard of their falsity.

34.    Specifically, at all relevant times, Beal knew that Miller was the CEO of JPOW, and was not and never had been an officer, executive or employee of Jingoli. Nevertheless, Beal directed her October 7, 2023 E-mails to Jingoli's clients and business partners in an effort to create the false impression that Miller is a Jingoli executive and to cast Jingoli in a false light as condoning the behavior falsely alleged by Beal in her TRO and California Complaint.

35.    Through its investigations to date, Jingoli has established a very high degree of confidence that the anonymous e-mail address (justice4womenofcolor@gmail.com) belongs to Beal.

36.    First, Jingoli's investigation has revealed that the e-mail address (justice4womenofcolor@gmail.com) is fictitious, does not belong to any business organization, and no such entity exists with respect to "Justice 4 Women of Color" or the like.

37.    Second, on October 9, 2023, correspondence was sent to Beal's counsel demanding she cease and desist from further dissemination of the attachments contained in the October 7, 2023 E-mails. Neither Beal nor her counsel have responded to the cease and desist or denied that she was the author of the emails from the anonymous account. (See October 9, 2023 cease-and-desist letter, attached as Exhibit "P").

38.     Most tellingly, other than JPOW and Miller (and those parties' counsel), Beal is the only other person who would possess the specific documents attached to the October 7, 2023 E-mails. If the attached documents (the California Complaint and the TRO) had been obtained by any other person from the publicly available electronic docket, the documents would have included the court's electronic filing notations. The lack of such notations indicates that the attachments are copies of the *original* pleadings that no other person would possess to be able to disseminate.

39.     Beal sent the October 7, 2023 E-mails and attachments as a brazen and malicious attempt to interfere with Jingoli's business relationships and prospective economic advantages, to defame and cast Jingoli in a false light, and to disparage Jingoli's business operations.

## COUNT I – TORTIOUS INTERFERENCE WITH CONTRACT

40.     Jingoli hereby incorporates by reference the preceding paragraphs of this Verified Complaint as if same were set forth at length herein.

41.     Jingoli has a protectable economic interest in its contractual relationships with its clients and business partners.

42.     By virtue of Beal's position with AVIVV, Beal possesses highly confidential knowledge and information about Jingoli's services, clients and business partners, contracts, and business operations.

43.     Beal sent the October 7, 2023 E-mails with malice, knowing that the accusations in the California Complaint and TRO are demonstrably false, and with the intention of interfering with Jingoli's economic and contractual relationships with its clients and business partners.

44.     At the time Beal sent the October 7, 2023 E-mails to Jingoli's clients and business partners, Beal knew the California Complaint and TRO contained false and defamatory statements, but she nevertheless sent those attachments in reckless disregard of their falsity.

45.     Specifically, at all relevant times, Beal knew that Miller was the CEO of JPOW, but was not and never had been an officer, executive or employee of Jingoli. Nevertheless, Beal directed her October 7, 2023 E-mails to <u>Jingoli</u> clients and business partners in an effort to create the false impression that Miller is a Jingoli executive and to cast Jingoli in a false light as condoning the behavior falsely alleged by Beal in her TRO and California Complaint.

46.     The underlying allegations are demonstrably false, and Beal knows them to be false, because Beal's own contemporaneous communications to Miller in 2021 through 2023 (see ¶¶ 25, 27, 29, 30 *supra*) directly contradict the truthfulness of her allegations in the California Complaint and TRO that she recklessly sent to Jingoli's clients and business partners.

47.     Beal's attempt to disguise herself by using an anonymous e-mail address, purporting to be from a fictional organization, also shows that Beal knew her allegations to be false at the time she sent the October 7, 2023 E-mails.

48.     Further indicative of Beal's knowledge regarding the falsity of the allegations contained in her October 7, 2023 E-mails is the fact that Beal did not respond or deny she was the sender when Jingoli's counsel sent her a demand to cease and desist from further dissemination of the California Complaint and TRO.

49.     There is a reasonable likelihood that this interference has caused and will continue to cause interference with Jingoli's contracts with its clients and business partners.

50.     As a direct and foreseeable result of Beal's actions in this regard, Jingoli has been forced to make substantial expenditures of money to proactively preserve its contractual and economic relationships and has suffered other economic and special damages.

**WHEREFORE**, Plaintiff, Joseph Jingoli & Son, Inc., hereby demands judgment in its favor, against Defendant Erica L. Beal, and requests an award of (i) injunctive relief preventing Beal from any and all conduct aimed at disrupting or harming the business interests of Jingoli and any of its Affiliate Companies, including but not limited to preventing Beal from further disseminations of her October 7, 2023 E-mails, or similar e-mails, to the clients and business partners of Jingoli and its Affiliate Companies; (ii) entry of a permanent injunction preventing Beal from disparaging Jingoli, Jingoli's Affiliate Companies, and their respective officers, executives and employees; (iii) compensatory damages in an amount to be determined at trial; (iv) punitive damages; (v) reasonable attorneys' fees, pre- and post- judgment interest; and (vi) any other relief as the Court deems just and proper.

## COUNT II – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

51.     Jingoli hereby incorporates by reference the preceding paragraphs of this Verified Complaint as if same were set forth at length herein.

52.     Jingoli has a protectable economic interest in its relationships with its clients and business partners.

53.     By virtue of Beal's position with AVIVV, Beal possesses highly confidential knowledge and information about Jingoli's services, clients and business partners, contracts, and business operations.

54.     Beal sent the October 7, 2023 E-mails with malice, knowing that the accusations in the California Complaint and TRO are demonstrably false as aforesaid, and with the intention of interfering with Jingoli's prospective economic gain.

55.     There is a reasonable likelihood that this interference has caused and will continue to cause interference with Jingoli's prospective economic gain.

56.     As a direct and foreseeable result of Beal's actions in this regard, Jingoli has been forced to make substantial expenditures of money to proactively preserve its contractual and economic relationships and has suffered other economic and special damages.

**WHEREFORE**, Plaintiff, Joseph Jingoli & Son, Inc., hereby demands judgment in its favor, against Defendant Erica L. Beal, and requests an award of (i) injunctive relief preventing Beal from any and all conduct aimed at disrupting or harming the business interests of Jingoli and any of its Affiliate Companies, including but not limited to preventing Beal from further disseminations of her October 7, 2023 E-mails, or similar e-mails, to the clients and business partners of Jingoli and its Affiliate Companies; (ii) entry of a permanent injunction preventing Beal from disparaging Jingoli, Jingoli's Affiliate Companies, and their respective officers, executives and employees; (iii) compensatory damages in an amount to be determined at trial; (iv) punitive damages; (v) reasonable attorneys' fees, pre- and post- judgment interest; and (vi) any other relief as the Court deems just and proper.

## COUNT III – DEFAMATION

57.     Jingoli hereby incorporates by reference the preceding paragraphs of this Verified Complaint as if same were set forth at length herein.

58.     By virtue of Beal's position with AVIVV, Beal possesses highly confidential knowledge and information about Jingoli's services, clients and business partners, contracts, and business operations.

59.     Beal sent the October 7, 2023 E-mails with malice, knowing that the accusations in the California Complaint and TRO are demonstrably false, and with the intention of circulating false and defamatory statements concerning Jingoli and harming Jingoli's reputation by casting it in a false light.

60.     At the time Beal sent the October 7, 2023 E-mails to Jingoli's clients and business partners, Beal knew the California Complaint and TRO contained false and defamatory statements, but she nevertheless sent those attachments in reckless disregard for their falsity.

61.     Specifically, at all relevant times, Beal knew that Miller was the CEO of JPOW, but was not and never had been an officer, executive or employee of Jingoli. Nevertheless, Beal directed her October 7, 2023 E-mails to <u>Jingoli</u> clients and business partners in an effort to create the false impression that Miller is a Jingoli executive and to cast Jingoli in a false light as condoning the behavior falsely alleged by Beal in her TRO and California Complaint.

62.     The underlying allegations are demonstrably false, and Beal knows them to be false, because Beal's own contemporaneous communications to Miller in 2021 through 2023 (see ¶¶ 25, 27, 29, 30, *supra*) directly contradict the truthfulness of her allegations in the California Complaint and TRO that she recklessly sent to Jingoli's clients and business partners.

63. Beal's attempt to disguise herself by using an anonymous e-mail address, purporting to be from a fictional organization, also shows that Beal knew her allegations to be false at the time she sent the October 7, 2023 E-mails.

64. Further indicative of Beal's knowledge regarding the falsity of the allegations contained in her October 7, 2023 E-mails is the fact that Beal did not respond or deny she was the sender when Jingoli's counsel sent her a demand to cease and desist from further dissemination of the California Complaint and TRO.

65. Beal's California Complaint and TRO do not concern Jingoli or its executives. Rather, the TRO concerns Karl Miller (who is neither an executive or employee of Jingoli) and the California Complaint concerns only Miller and JPOW.

66. Beal's defamatory statements and false claims asserted against Karl Miller and JPOW, which were sent to Jingoli's clients and business partners, create a false light regarding an "immediate safety concern" with respect to Jingoli, falsely implies Jingoli approves of certain conduct, and falsely implicates Jingoli with respect to the Beal's false and defamatory allegations in the TRO and California Complaint.

67. As a direct and foreseeable result of Beal's defamatory communications, Jingoli's good name and reputation, as well as its standing in relation to its business and trade, have been substantially impugned in a manner that cannot be valued or remedied via monetary damages.

68. As a direct and foreseeable result of Beal's defamatory communications, Jingoli's relationships with clients and business partners, as well as with industry and trade peers, have been damaged in a manner that cannot be valued or remedied via monetary damages.

69.     As a direct and foreseeable result of Beal's actions in this regard, Jingoli has been forced to make substantial expenditures of money to proactively prevent additional damage to its reputation and relationships, and has suffered other economic and special damages.

**WHEREFORE**, Plaintiff, Joseph Jingoli & Son, Inc., hereby demands judgment in its favor, against Defendant Erica L. Beal, and requests an award of (i) injunctive relief preventing Beal from any and all conduct aimed at disrupting or harming the business interests of Jingoli and any of its Affiliate Companies, including but not limited to preventing Beal from further disseminations of her October 7, 2023 E-mails, or similar e-mails, to the clients and business partners of Jingoli and its Affiliate Companies; (ii) entry of a permanent injunction preventing Beal from disparaging Jingoli, Jingoli's Affiliate Companies, and their respective officers, executives and employees; (iii) compensatory damages in an amount to be determined at trial; (iv) punitive damages; (v) reasonable attorneys' fees, pre- and post- judgment interest; and (vi) any other relief as the Court deems just and proper.

## COUNT IV – DISPARAGEMENT

70.     Jingoli hereby incorporates by reference the preceding paragraphs of this Verified Complaint as if same were set forth at length herein.

71.     Jingoli has a protectable economic interest in its relationships with its clients and business partners.

72.     By virtue of Beal's position with AVIVV, Beal possesses highly confidential knowledge and information about Jingoli's services, clients and business partners, contracts, and business operations.

73.    Beal sent the October 7, 2023 E-mails to Jingoli's clients and business partners with malice, knowing that the accusations in the California Complaint and TRO are demonstrably false as aforesaid, and with the intention of (1) circulating false and material derogatory statements as to the quality of Jingoli's business, (2) hindering Jingoli's business, (3) preventing others from doing business with Jingoli, and (3) adversely interfering with Jingoli's business interests.

74.    At the time Beal sent the October 7, 2023 E-mails to Jingoli's clients and business partners, Beal knew the California Complaint and TRO contained false and defamatory statements, but she nevertheless sent those attachments in reckless disregard for their falsity.

75.    As a direct and foreseeable result of Beal's disparaging and defamatory communications, Jingoli's reputation and standing in relation to its business and trade has been substantially impugned in a manner that cannot be valued or remedied via monetary damages.

76.    As a direct and foreseeable result of Beal's disparaging and defamatory communications, Jingoli's relationships with clients and business partners, as well as with industry and trade peers, have been damaged in a manner that cannot be valued or remedied via monetary damages.

77.    As a direct and foreseeable result of Beal's actions in this regard, Jingoli has been forced to make substantial expenditures of money to proactively prevent additional damage to its reputation and relationships, and has suffered other economic and special damages.

**WHEREFORE**, Plaintiff, Joseph Jingoli & Son, Inc., hereby demands judgment in its favor, against Defendant Erica L. Beal, and requests an award of (i) injunctive relief preventing Beal from any and all conduct aimed at disrupting or harming the business interests of Jingoli and any of its Affiliate Companies, including but not limited to preventing Beal from further disseminations of her October 7, 2023 E-mails, or similar e-mails, to the clients and business

partners of Jingoli and its Affiliate Companies; (ii) entry of a permanent injunction preventing

Beal from disparaging Jingoli, Jingoli's Affiliate Companies, and their respective officers,

executives and employees; (iii) compensatory damages in an amount to be determined at trial; (iv)

punitive damages; (v) reasonable attorneys' fees, pre- and post- judgment interest; and (vi) any

other relief as the Court deems just and proper.

Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC
*Attorneys for Plaintiff, Joseph Jingoli & Son, Inc.*

By: _____
       Robert P. Zoller, Esq.
       Christopher E. Torkelson, Esq.
       Karlee M. Martin, Esq.

Dated: October 13, 2023

**VERIFICATION**

I, Joseph R. Jingoli, Jr., the Chief Executive Officer of Joseph Jingoli & Son, Inc., the Plaintiff in the above matter, hereby certify that I have read the Verified Complaint and that to the best of my knowledge, information and belief, the foregoing factual statements made in support thereof are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____

Joseph R. Jingoli, Jr

Dated: October 13, 2023

## CERTIFICATION PURSUANT TO R. 4:5-1 and 1:38-7(b)

I hereby certify, that to the best of my knowledge, information and belief, the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding nor is any other action or arbitration proceeding contemplated and I am not aware of any other parties that should be joined in the action at this time. I further certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

By: _____
        Robert P. Zoller, Esq.

Dated: October 13, 2023

# EXHIBIT "A"

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF

# AVIVV, LLC

This Limited Liability Company Operating Agreement (including the appendices attached hereto, the "Agreement") of AVIVV, LLC, a New Jersey multi-member limited liability company ("AVIVV" or "Company"), is made as of the 10th day of September, 2019, by and among Erica L. Beal ("Beal") and Jingoli Power, LLC, a New Jersey limited liability company ("JPOW"). Beal and JPOW are collectively referred to herein as "Members" and individually as a "Member".

**ARTICLE I**     **Definitions.**

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I unless otherwise expressly provided.

1.1     **"Act"** means the New Jersey Limited Liability Company Act, as amended.

1.2     **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Operating Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)     Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1 (b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.3     **"Affiliate"** means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. "Controlled Affiliate" means, with respect to any Person: (a) any Person directly or indirectly controlled by such Person, and (b) any Person a majority of whose equity securities are owned directly or indirectly by such Person. For purposes of these definitions, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.4     **"Agreement"** means the Limited Liability Company Operating Agreement of the Company made by Erica L. Beal and Jingoli Power, LLC, as the Members of the Company.

1.5     **"Assets"** has the meaning defined in Section 3.1 (a).

1.6     **"Business"** has the meaning given that term in Section 3.1.

1.7     **"Capital Account"** means, with respect to any Member, the Capital Account maintained for such Person in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 4.8 or 4.9 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any Property distributed to such Member.

(ii)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Operating Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 4.8 or 4.9 hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)     In the event any interest in the Company is transferred in accordance with the terms of this Operating Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)     In determining the amount of any liability for purposes of Sections 1.7(i) and 1.7(ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Operating Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.7041 (b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Executive Committee shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Executive Committee may make such modification, provided that is not likely to have a material effect on the amounts distributable to any Member pursuant to Article IX hereof upon the dissolution of the Company.  The Executive Committee also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Regulations Section 1.7041(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event

-2-

unanticipated events might otherwise cause this Operating Agreement not to comply with Regulations Section 1.7041(b).

**1.8** **"Capital Contribution"** means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Percentage Interest held by such Member pursuant to the terms of this Operating Agreement. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or by a Person related to the maker of the note within the meaning of Regulations Section 1.7041(b)(2)(ii)(c)) shall not be included in the Capital Contribution of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.7041(b)(2)(iv)(d)(2).

**1.9** **"Company Minimum Gain"** refers to "partnership minimum gain" as set forth in Regulations Sections 1.7042(b)(2) and 1.7042(d).

**1.10** **"Certificate of Formation"** means the Certificate of Formation of the Company as filed with the Secretary of State of New Jersey, as the same may be amended or restated from time to time.

**1.11** **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

**1.12** **"Company"** means AVIVV, LLC, a New Jersey Limited Liability company.

**1.13** This section has been intentionally omitted.

**1.14** **"Controlled Affiliate"** has the meaning defined in Section 1.3.

**1.15** **"Covered Person"** is any Member, Executive Committee member, employee or agent of the Company.

**1.16** **"Depreciation"** means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Executive Committee.

**1.17** **"Effective Date"** means the date on which the Certificate of Formation is filed with the New Jersey Secretary of State, or such later date as may be specified in the Certificate of Formation.

**1.18** **"Gross Asset Value"** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Members;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Executive Committee, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Regulations Section 1.7041(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Executive Committee reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)   The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Executive Committee; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Sections 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.7041 (b)(2)(iv)(m) and Sections 2.01(42)(vi) and 9.03(e) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 1.18(iv) to the extent the Executive Committee determines that an adjustment pursuant to Section 1.18(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.18(iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to these Sections 1.18(i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

**1.19**   This section has been intentionally omitted.

**1.20**   **"Entity"** means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association, or any foreign trust, or foreign business organization.

**1.21**   **"Event of Dissolution"** has the meaning defined in Section 9.1.

**1.22** **"Executive Committee"** has the meaning defined in Section 5.2(a).

**1.23** **"Fiscal Year"** means (i) the period commencing on the Effective Date and ending on the immediately succeeding December 31, and (ii) any subsequent twelve month period commencing on January 1 and ending on December 31, and any portion of said subsequent period for which the Company is required to allocate Profits, Losses, and other items of Company income, gain, loss, or deduction.

**1.24** This section has been intentionally omitted.

**1.25** This section has been intentionally omitted.

**1.26** **"Member"** or **"Members"** means Erica L. Beal and/or Jingoli Power, LLC.

**1.27** This section has been intentionally omitted.

**1.28** **"Member Nonrecourse Debt"** Refers to "partner nonrecourse debt" as set forth in Regulations Section 1.7042(b)(4).

**1.29** **"Member Nonrecourse Debt Minimum Gain"** means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.7042(i)(3).

**1.30** **"Member Nonrecourse Deductions"** Refers to "partner nonrecourse deductions" as set forth in Regulations Sections 1.7042(i)(1) and 1.7042(i)(2).

**1.31** **"Net Cash From Operations"** means the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Executive Committee. "Net Cash From Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

**1.32** **"Nonrecourse Deductions"** has the meaning set forth in Regulations Section 1.7042(b)(3).

**1.33** **"Nonrecourse Liability"** has the meaning set forth in Regulations Section 1.7042(b)(3).

**1.34** **"Percentage Interest"** means, subject to Section 4.3, as to Beal having 51% of all interests in the Company and JPOW having 49% of all interests in the Company, which shall be such Member's percentage share of (i) total Profits or Losses of the Company to be allocated; (ii) the total amount of the initial and each additional capital contribution; and (iii) the total amount of each distribution.

**1.35**   **"Person"** means any individual or Entity, and the executors, administrators, legal representatives, successors, and assigns of a "Person" when the context so permits.

**1.36**   **"Profits and Losses"** means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

> (i)   Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

> (ii)   Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.7041(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or added to such loss;

> (iii)   In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 1.18(ii) or Section 1.18(iii) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

> (iv)   Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

> (v)   In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with Section 1.16 hereof;

> (vi)   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required pursuant to Regulations Section 1.7041(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses;

(vii)  Notwithstanding any other provision of this Section 1.36, any items which are specially allocated pursuant to Sections 4.8 and 4.9 hereof shall not be taken into account in computing Profits or Losses; and

(viii)  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Sections 4.8 and 4.9 hereof shall be determined by applying rules analogous to those set forth in Sections 1.36(i) through 1.36(vii) above.

1.37  **"Property"** means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

1.38  **"Regulations"** means Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

1.39  **"Regulatory Allocations"** has the meaning set forth in Section 4.9 hereof.

1.40  This section has been intentionally omitted.

1.41  This section has been intentionally omitted.

1.42  **"Taxing Jurisdiction"** means any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

1.43  **"Transfer"** means, in either noun or verb form, any voluntary or involuntary transfer, sale, or other disposition.

## ARTICLE II     Formation, Term, Name and Status.

2.1  **Formation.** The Company was formed pursuant to Section 11 of the Act, on September 10, 2019 (the "Date of Formation"), by the filing of a Certificate of Formation (the "Certificate") with the New Jersey Department of Treasury, Division of Revenue thereby establishing the Company as a New Jersey limited liability company.  The Company shall be operated and shall conduct its business in accordance with the Act, except to the extent modified by the terms of this Agreement.  Upon the execution of the Operating Agreement and the proper filing of the Certificate of Formation with the New Jersey Department of Treasury, Division of Revenue, Beal and JPOW shall be admitted as the Members of the Company.

2.2  **Term.** The term of the Company shall commence on the Effective Date and, unless sooner dissolved in accordance with this Agreement or as required by statute, shall be perpetual.

**2.3     Name.** The name of the Company is AVIVV, LLC.

**2.4     No State Law Partnership, Liability to Third Parties.** The Members intend that the Company not be a partnership (including, without limitation, a limited partnership), and that no Member be a partner or joint venture of any other Member nor assume the duties that either such status may impose, for any purposes other than federal and state tax purposes, and that this Agreement not be construed otherwise. Except to the limited extent expressly provided in Section 7.3(a), no Member shall be liable for the debts, obligations or liabilities of the Company to third parties, including under a judgment, decree or order of a court.

**2.5     Agreement, Effect of Inconsistencies with Act.** For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Operating Agreement hereby agree to the terms and conditions of this Operating Agreement, as it may from time to time be amended according to its terms. It is the express intention of the Members that this Operating Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of this Operating Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Operating Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, this Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment. The Members hereby agree that each Member shall be entitled to rely on the provisions of this Operating Agreement, and no Member shall be liable to the Company or to any Member for any action or refusal to act taken in good faith reliance on the terms of this Operating Agreement. The Members hereby agree that the duties and obligations imposed on the Members as such shall be those set forth in this Operating Agreement, which is intended to govern the relationship among the Company and the Members, notwithstanding any provision of the Act or common law to the contrary.

**2.6     Confirmation of Status, Scope of Authority.** Each Member hereby confirms and agrees to its status as a Member upon the terms and conditions set forth in this Agreement.

**2.7     Principal Office.** The principal office of the Company shall be located at 100 Lenox Drive, Suite 100, Lawrenceville, NJ 08648.

-8-

ARTICLE III        Purpose, Exclusive Dealings, and Assets.

3.1    Purpose.

(a)    The Company is being organized for the purpose of providing project execution services for private and public utility projects, specifically electric transmission, substation and distribution projects, including: (i) engineering, procurement and construction contracts; (ii) general contractor services; (iii) staff augmentation professional services; (iv) construction and project management services; and (v) any other activity to which the Members agree. (the "Business").  The Executive Committee shall have no authority to undertake any activity outside of the parameters of the Business without the approval of the Members.

(b)    In addition, the Company may engage in any act concerning any or all other business or activity that now or hereafter may be necessary, incidental, proper, advisable, or convenient to accomplish the foregoing purposes and that is not forbidden by the law of the jurisdiction in which the Company engages in that business; provided, however, that notwithstanding anything stated herein to the contrary, the Company shall not engage in any activity which would cause the Company to be a "public utility company" or a "holding company" as such terms are used in the Public Utility Holding Company Act of 1935, as amended.  The Company may accomplish the purposes set forth in this Section 3.1 by entering into any contract, subject to the provisions of this Agreement, or taking any other action permitted under the Act and any other applicable law and necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

(c)    Any Member may engage in or possess an interest in other business ventures of every nature and description, independently or with others, and neither the Company nor the Members shall have any right by virtue of this Agreement in such other business ventures or to the income or profits derived there from.

(d)    The Company exists only for the purposes specified in this Article III, and may not conduct any business other than the Business without the approval of the Members. Furthermore, notwithstanding the provisions of this Agreement, the Company shall not do business in any jurisdiction that would jeopardize the limitation on liability afforded to the Members under the Act or this Operating Agreement.

3.2    **Responsibility for Warranties and System Support.** No Member shall be responsible for any warranties or guarantees provided by the Company.  The Company shall be solely responsible for any warranties or guarantees arising in the operation of the Business.

ARTICLE IV        Member Contributions, Allocations, Distributions and Taxes.

**4.1    Initial Capital Contribution**. The names, addresses, initial Capital Contributions, and Percentage Interests of the Members are set forth below.  The initial Capital Contributions shall be made concurrently with the last execution of this Operating Agreement.  The Members acknowledge that the interests in the Company have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the Members without appropriate registration or the availability of an exemption from such requirements.

ERICA L. BEAL                  $1,501           51% Percentage Interest
5173 Waring Road
Suite 87
San Diego, CA  92120

JINGOLI POWER, LLC             $1,500           49% Percentage Interest
100 Lenox Drive
Suite 100
Lawrenceville, NJ 08648

**4.2    Capital Accounts.**  A Capital Account shall be established and maintained for the Members.

**4.3    Additional Capital Contributions.**

Additional monetary Capital Contributions may be requested by the Executive Committee in its reasonable discretion as may be needed to cover ongoing operating expenses or to cover losses the Company has incurred.  Such additional monetary Capital Contributions shall be payable in cash in proportion to the Percentage Interests of the Members. Except as stated above, no Member shall be required to make any additional monetary capital contributions.

**4.4    Loans**.  If any Member shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution of the Company but shall be a debt due from the Company.  The amount of such loan or advance by a lending Member shall be repayable out of the Company's cash and shall bear reasonable interest at the rate agreed between the Company and the lending Member.

**4.5    Other Matters**.

(a)    Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein.

(b)    No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except as otherwise provided in this Operating Agreement.

(c)     Each Member waives any and all rights that it may have to maintain an action for partition of the Company's Property.

**4.6     Profits**. After giving effect to the special allocations set forth in Sections 4.8 and 4.9 hereof, Profits for any Fiscal Year shall be allocated to the Members.

**4.7     Losses**.

(a)     After giving effect to the special allocations set forth in Sections 4.8 and 4.9 hereof, Losses for any Fiscal Year shall be allocated to the Members.

(b)     The Losses allocated pursuant to Section 4.7(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing the Members to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.

**4.8     Special Allocations**. The following special allocations shall be made in the following order:

(a)     <u>Minimum Gain Chargeback</u>. Except as otherwise provided in Regulations Section 1.7042(f), notwithstanding any other provision of this Article IV, if there is a net decrease in Company Minimum Gain during any Company Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.7042(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.7042(f)(6) and 1.70420)(2). This Section 4.8(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.7041 (f) and shall be interpreted consistently therewith.

(b)     <u>Member Minimum Gain Chargeback</u>.  Except as otherwise provided in Regulations Section 1.7041 (i)(4), notwithstanding any other provision of this Article IV, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.7042(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.7042(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.7042(i)(4) and 1.70420)(2). This Section 4.8(b) is intended to comply with the minimum gain chargeback

-11-

requirement in Regulations Section 1.7042(i)(4) and shall be interpreted consistently therewith.

(c)   _Nonrecourse Deductions._ Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Members.

(d)   _Member Nonrecourse Deductions._ Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member.

(e)   _Code Section 754 Adjustment._ To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Regulations Sections 1.7041(b)(2)(iv)(m)(2) or 1.7041(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Member.

(f)   _Allocations Relating to Taxable Issuance of Percentage Interests._ Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an interest in the Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Operating Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

(g)   _Qualified Income Offset._ In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Sections 1.7041(b)(2)(ii)(d) (4), 1.704(b)(2)(ii)(d)(5), or 1.7041(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.8(g) shall be made only if and to the extent that such Member would have an adjusted Capital Account Deficit after all other allocations provided for in this Section 4.8 have been tentatively made as if this Section 4.8(g) were not included in this Operating Agreement.

**4.9   Curative Allocations.** The allocations set forth in Sections 4.8(a), 4.8(b), 4.8(c), 4.8(d), 4.8(e) and 4.8(g) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.9. Therefore, notwithstanding any other provision of this Article IV (other than the Regulatory Allocations), the Executive Committee shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible,

equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Operating Agreement and all Company items were allocated pursuant to Sections 4.6 and 4.7 hereof. In exercising its discretion under this Section 4.9, the Executive Committee shall take into account future Regulatory Allocations under Sections 4.8(a) and 4.8(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 4.8(c) and 4.8(d).

**4.10    Other Allocation Rules.**

(a)     The Members are aware of the income tax consequences of the allocations made by this Article IV and hereby agrees to be bound by the provisions of this Article IV in reporting their shares of Company income and loss for income tax purposes.

(b)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Executive Committee using any permissible method under Code Section 706 and the Regulations thereunder.

(c)     Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Regulations Section 1.7523(a) (3), the Members' interests in Company profits are in proportion to their Percentage Interests.

(d)     To the extent permitted by Regulations Section 1.7042(h)(3), the Executive Committee shall endeavor not to treat distributions of Net Cash from Operations as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt.

**4.11    Tax Allocations: Code Section 704(c).** In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with Section 1.18 hereof).

In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 1.18 hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Executive Committee in any manner that reasonably reflects the purpose and intention of this Operating Agreement. Allocations pursuant to this Section 4.11 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Operating Agreement.

**4.12   Tax Characterization and Returns**.

(a)   The Members acknowledge that the Company will be treated as a "partnership" for federal and State of New Jersey state tax purposes. All provisions of this Operating Agreement and the Company's Articles of Organization are to be construed so as to preserve that tax status.

(b)   In accordance with Section 10.3, within ninety (90) days after the end of each Fiscal Year, the Executive Committee will cause to be delivered to each person who was a Member at any time during such Fiscal Year a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of each Member's federal or state income tax (or information) returns, including a statement showing each Member's share of income, gain or loss, and credits for the Fiscal Year.

**4.13   Tax Elections**. The Executive Committee may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company, including the election referred to in Code Section 754 to adjust the basis of Company assets.

**4.14   Taxes of Taxing Jurisdictions**.   To the extent that the laws of any Taxing Jurisdiction require, each Member (or such Members as maybe required by the Taxing Jurisdiction) will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest, and penalties assessed on such income. If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income.

The Tax Partner on behalf of the Executive Committee, where permitted by the rules of any Taxing Jurisdiction, may file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

**4.15   Tax Matters Partner**. JPOW is initially designated as the "tax matters partner" of the Company pursuant to Code Section 321 (a)(7). Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223. Any Member who is designated tax matters partner may not take any action contemplated by Code Sections 6222 through 6232 without the consent of the other Member.

## ARTICLE V  Management.

**5.1  Management by the Members.**  The business and affairs of the Company shall be directed by its Members in accordance with the provisions of this Agreement as set forth below.

### 5.2 Executive Committee.

(a)  The Company shall be managed by and at the direction of its Members, Beal and JPOW. The Company shall be managed through a committee consisting of Beal and one representative of JPOW (the "Executive Committee"). Each meeting of the Executive Committee shall be deemed a meeting of the Members. Meetings of the Members (apart from meetings of the Executive Committee) are neither necessary nor required.

(b)  From time to time, the Members shall elect its representatives to the Executive Committee, and such election shall be communicated in writing to the Company. At the time of formation, Beal is a representative and JPOW names Brian J. Gibson as its representative.

(c)  The Executive Committee shall have the authority to manage and establish policies and strategies of the Company including, without limitation, the authority to:

(i)  enter into any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance and operation of the property of the Company, or in connection with managing the affairs of the Company, including amendments to this Agreement and the Certificate of Formation in accordance with the terms of this Agreement;

(ii)  allocate and distribute Profits and Losses to Members in accordance with their Percentage Interests;

(iii)  establish an Operating Committee, if desired, establish and modify Operating Committee Procedures from time to time;

(iv)  establish reserves from Profits which otherwise would be distributed to Members;

(v)  borrow money and issue evidence of indebtedness necessary, convenient, or incidental to the accomplishment of the purpose of the Company; and secure the same by mortgage, pledge, or other lien on any property or asset of the Company;

(vi)  prepay in whole or part, refinance, recast, increase, modify or extend any liabilities affecting the property of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such property;

-15-

(vii)   invest, manage, and distribute Company funds to the Members in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement, including but not limited to opening and maintaining Company bank accounts and authorizing signatories with respect thereto;

(viii)   employ accountants, legal counsel, managing agents and other Persons (including but not limited to Affiliates of Members, subject to Section 6.1 of the Agreement) to perform service for the Company and to compensate them from Company funds;

(ix)   make any and all elections for federal, state, and local tax purposes including, without limitation, any election, if permitted by applicable law: (A) to adjust the basis of property of the Company pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with Company distributions; (B) to extend the statute of limitations for assessment of tax deficiencies against Members with respect to adjustments to the Company's federal, state, or local tax returns; and (C) to the extent provided in Code Sections 6221 through 6231, to represent the Company and its Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and its Members, and to file any tax returns and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company or the Members;

(x)   institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(xi)   engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to property of the Company) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the Act;

(xii)   take, or refrain from taking, all actions not expressly proscribed or limited by or addressed in this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company, including but not limited to the establishment, maintenance, and expenditure of reserves to provide for working capital, debt service, and such other purposes as it may deem necessary or advisable;

(xiii)   sell all or substantially all of the assets of the Company;

(xiv)   merge or consolidate the Company;

(xv)   mortgage or encumber all or substantially all of the assets of the Company;

(xvi)   approve the Company's budget;

(xvii)   vote to dissolve the Company;

(xviii)   vote to seek bankruptcy protection for the Company; and

(xix)   distribute excess cash to the Members.

(d)   Any decision or act of the Executive Committee taken in accord with the provisions of this Agreement shall control and bind the Company.

(e)   Any Member may replace any or all of its representatives on the Executive Committee at any time.

**5.3   Decisions of the Executive Committee.**   All decisions of the Executive Committee require the assent of a majority of the membership interests held in the Company

**5.4   Right to Rely on Executive Committee.**

(a)   Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by any member of the Executive Committee as to:

(i)   the identity of any member of the Executive or Operating Committees or Member of the Company;

(ii)   the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Executive Committees or which are in any other manner germane to the affairs of the Company;

(iii)   the Persons who are authorized to execute and deliver any instrument or document of the Company; or

(iv)   any act or failure to act by the Company or any other matter whatsoever involving the Company or any member of the Executive Committee, or any Member of the Company.

(b)   The signature of any Member of the Executive Committee shall be sufficient to execute any document or authorize payment on behalf of the Company, provided that such action has been properly authorized by the Executive Committee.

-17-

**5.5     Designation of Officer Titles**.  The Members may provide officer titles for members of the Executive Committee of the Company.  The officer titles may include, but shall not be limited to, a Chairman, a President, one or more Vice Presidents, a Treasurer, a Secretary and such other officer titles as the Members decide to appoint.

The Executive Committee shall appoint and elect, and shall have the power to terminate and remove with or without cause, such officers ("**Officers**") as it determines necessary or expedient in carrying out the Company's business and affairs.  Such Officers shall have such duties, responsibilities and authority as shall be delegated to each of them by the Executive Committee.  Other Officers may from time to time be elected by the Executive Committee and be given such titles, duties and responsibilities as are commensurate with their duties and responsibilities as determined by the Executive Committee.  The Executive Committee shall have authority to fix the compensation of, and to enter into employment agreements with, any Officer of the Company on such terms as the Executive Committee shall determine in each individual case in its sole and absolute discretion.

As of the date hereof, the Company shall have an Officer that is designated as the Managing Partner.  Beal shall be the initial Managing Partner.  The Managing Partner, subject to the direction of the Executive Committee, shall have general charge of the business, affairs and property of the Company and general supervision of its other Officers and agents.  Unless otherwise prescribed by the Executive Committee, the Managing Partner shall have full power and authority on behalf of the Company to attend, act and vote at any meeting of security holders of any corporations, partnerships, limited liability companies or other business entities in which the Company may hold securities.  At such meeting(s), the Managing Partner shall possess and may exercise any and all rights and powers incident to the ownership of such securities which the Company might have possessed and exercised if it had been present.  The Managing Partner shall have authority to sign and execute in the Company name all appropriate agreements, mortgages, bonds, contracts and other instruments, except in cases in which the signing or execution thereof shall be expressly delegated by the Executive Committee to some other officer or agent of the Company.  The Executive Committee may from time to time confer like powers and authority upon any other person or persons.

The Managing Partner has established the following Officer positions:

Chief Executive Officer: Erica L. Beal
President: Brian J. Gibson

Only the Managing Partner may amend the appointment of the Officers.

**5.6     Functioning of the Executive Committee**

(a)     Quorum and Voting.  The majority of membership interests must be represented at a meeting of the Executive Committee in order to have a quorum for the

conducting of business. Votes shall be determined based on percentage of membership interests held and all decisions are by majority vote

(b)  <u>Chairman</u>. One of the members of the Executive Committee shall serve as the Chairman of the Executive Committee for a term of one year. The initial Chairman of the Executive Committee shall be Erica L. Beal.

(c)  <u>Meetings</u>. Regular meetings of the Executive Committee shall be held as determined by the Chairman of the Executive Committee, but at least twice annually. Members of the Executive Committee may participate in a meeting of the Executive Committee by a means of a conference telephone or similar communications equipment whereby all persons participating in the meeting can hear each other and be heard sufficiently to permit contemporaneous exchange and debate. Participation in a meeting in this manner shall constitute presence in person at the meeting.

(d)  <u>Notice, Waiver, and Minutes</u>. All members of the Executive Committee shall receive a notice of each regular meeting of the Executive Committee together with a copy of the proposed agenda for such meeting at least five days prior to a scheduled regular meeting date. The Chairman or any two members of the Executive Committee may, upon two days' notice (such notice to include a proposed agenda) to the other members of the Executive Committee, call a special meeting of the Executive Committee at any time. Attendance at any meeting of the Executive Committee (either in person or by means of conference telephone or similar communications equipment) shall constitute waiver of notice thereof. The Executive Committee shall cause minutes of its meetings to be kept which shall be open for inspection by any Member at any time.

(e)  <u>Alternate Representatives</u>. Each member of the Executive Committee shall be entitled to appoint (and to change) an alternate representative to attend meetings of the Executive Committee in such member's place. An alternate may not be a member of the Executive Committee in his own right. An alternate representative shall not be entitled to vote in his capacity as such at any meeting at which his appointer is present.

(f)  <u>Action Without Meeting</u>. Any action which may be taken by the Executive Committee at a meeting thereof may be taken without a meeting by the unanimous written consent of all members of the Executive Committee.

**ARTICLE VI     RESERVED**

**ARTICLE VII   <u>Liabilities, Limitation of Liabilities and Indemnification</u>**.

7.1   **Limitation of Liability of Members, and Executive Committee Members**. It is specifically understood and agreed that:

(a)  a Member or Executive Committee member shall not be required to devote full time to Company business;

(b)     no doctrine similar to the doctrine of corporate opportunity shall apply with regard to the actions or activities of any Member or Executive Committee member;

(c)     except as expressly otherwise provided herein to the contrary, each Member and Executive Committee member shall be free to conduct any business or activity whatsoever, without obligation to the Company or the Member;

(d)     except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person; and

(e)     except as otherwise required by law, a Member, in its capacity as Member, shall have no liability in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed Profits of the Company, (iii) its obligation to make other payments expressly provided for in this Operating Agreement, and (iv) the amount of any distributions wrongfully distributed to it.

**7.2     Actions Beyond Scope of Agreement.**  Any Member who binds or obligates the Company for any debt or liability or causes the Company to act except in accordance with the provisions of this Agreement shall be liable to the Company for any such debt, liability or act.

**7.3     Indemnification.**

(a)     To the fullest extent permitted by law, a Member (herein the "Indemnifying Member") shall INDEMNIFY and DEFEND the Company and the other Member and HOLD them HARMLESS from and against all claims, losses, costs, liabilities, damages and expenses (including, without limitation, costs of suit or proceeding and attorneys' fees) they may incur by virtue of claims by third parties arising out of any action of the Indemnifying Member that could obligate or bind the Company for any debt, liability or act except as such may be incurred in accordance with the provisions of this Agreement. For the avoidance of doubt, the Members agree that the indemnification provided in the immediately preceding sentence applies only to claims by third parties.

(b)     To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Operating Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions or if a judgment or other final adjudication adverse to such Covered Person establishes that the Covered Person's acts or omissions were in bad faith or involved intentional misconduct or a

-20-

knowing violation of law or that the Covered Person personally gained in fact a financial profit or other advantage to which the Covered Person is not entitled; *provided, however*, that any indemnity pursuant to this Section shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

(c)     The Company may purchase and maintain insurance, to the extent and in such amounts as the Executive Committee shall, in its sole discretion, deem reasonable, on behalf of such of the Covered Persons and other Persons as the Executive Committee shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Operating Agreement.  The Company may, with the approval of the Executive Committee, enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 7.3 hereof and containing such other procedures regarding indemnification as are appropriate.

(d)     To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 7.3 hereof.

**ARTICLE VIII**     RESERVED

**ARTICLE IX**     **Dissolution and Termination.**

**9.1**          **Events of Dissolution.**  Each of the following shall each be an "Event of Dissolution":

(a)     a decision by the Executive Committee to dissolve the Company;

(b)     a material breach of this Agreement (other than a breach of Article XIII) by a Member and the continuation of such breach for 30 days after the other Member has given written notice of such breach and of its election to dissolve the breaching Member;

(c)     the expulsion, bankruptcy (which shall mean being the subject of an order for relief under Title 11 of the United States Code), or dissolution of a Member, or occurrence of any other event that terminates the continued membership of a Member in the Company;

-21-

(d)      a Change of Control of a Member, at the written election of either Member to dissolve where:

(i)      for purposes of this Section 9.1   a "Change of Control" means:

(A)      the acquisition, directly or indirectly, of 25% or more of the voting securities of a Member by any Person other than a Person who owns, directly or indirectly, 25% or more of such securities on the Effective Date, or

(B)      the ability to elect a majority of the directors of a Member by any Person other than a Person who possesses such ability on the Effective Date; and

(ii)      notwithstanding Section 9.1(d)(i) above, a public offering or distribution to existing shareholders of the securities of a Member or its Affiliates or a management buyout of all the shares of the securities of a Member shall not be deemed an Event of Dissolution;

(e)      as otherwise required by the Act, including but not limited to the entry of a decree of judicial dissolution pursuant to the Act;

**9.2      Effect of Dissolution.**

(a)      Upon the occurrence of an Event of Dissolution set forth in Section 9.1, the Executive Committee shall commence dissolution of the Company which shall continue solely for the purpose of winding up its affairs in an orderly manner, disposing of its Assets in a commercially reasonable manner consistent with obtaining the fair market value thereof, and satisfying the claims of its creditors and Members.

(b)      After the occurrence of an Event of Dissolution, the obligations of each Member to offer Transaction Opportunities to the Company shall be terminated.  The Executive Committee shall cause the Company's Assets to be disposed of as promptly as is consistent with obtaining the fair market value thereof (or limiting loss incurred with respect thereto).

(c)      The Executive Committee shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and property, and shall cause the proceeds from the liquidation of the Company's property, to the extent sufficient therefore, to be applied and distributed in the following order:

(i)      first, to the payment and discharge of all the Company's debts and liabilities to creditors other than Members or their Affiliates;

(ii)      second, to the payment and discharge of all of the Company's debts and liabilities to Members and their Affiliates; and

(iii)     third, to the Members pro rata in accordance with their positive capital account balances, after giving effect to all contributions, distributions, and allocations for all periods.

(d)     No Member shall receive any additional compensation for any services performed pursuant to this Section 9.2. Each Member understands and agrees that by accepting the provisions of this Section 9.2 setting forth the priority of the distribution of the assets of the Company to be made upon its liquidation, such Member expressly waives any right which it, as a creditor of the Company, might otherwise have under the Act to receive distributions of assets of the Company in satisfaction of any liability of the Company, and hereby subordinates to said creditors any such right.

(e)     After an Event of Dissolution, no Member or member of the Executive Committee shall take any action that is inconsistent with, or not appropriate for, winding up the Company's business and affairs.

(f)     To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company Assets have been disposed of or distributed and the Company's risk management contracts satisfied or terminated.  When that has occurred, the Members shall have no further obligations under this Agreement except under Sections 13.2, 13.3 and 13.4, which shall survive dissolution and winding up of the Company.

**9.3     Filing of Articles of Cancellation**.  Upon the completion of the disposition of the Assets pursuant to Section 9.2, the Executive Committee shall (or, on the failure of the Executive Committee to act, the Member may) promptly file a Certificate of Cancellation with the office of the New Jersey Secretary of State.

**9.4     Reserve**.  Notwithstanding the provisions of Section 9.2, the Executive Committee may retain such funds as it deems necessary as a reserve for any contingent liabilities or obligations of the Company, which reserve, after the passage of a reasonable period of time, shall be distributed pursuant to Section 9.2(c).

**ARTICLE X          Accounting and Bank Accounts.**

**10.1     Accounting Method**.  The books of the Company shall be kept using accrual accounting in accordance with generally accepted accounting principles.

**10.2     Books and Records**.  The books and records of the Company shall be maintained at the office of the Member which provides bookkeeping services.  Books and records shall be maintained for the longer of two years or any period required by applicable statute or regulation. In any event, the other Member, at its expense, shall have the right during ordinary business hours and upon reasonable notice to inspect and copy such books and records.

**10.3     Financial Reports.**

(a)     The Company shall cause to be prepared and delivered to the Member, financial statements of the Company in such detail and with such frequency as the Member may reasonably request, together with all information with respect to the Company necessary for the preparation of the Member's federal, state, and local income tax returns.

(b)  At the Member's request, the annual financials may be audited at the expense of the Company.

**10.4     Tax Returns and Elections**.  The Company shall cause to be prepared and timely filed all federal, state and local income tax returns or other returns or statements required by applicable law.  The Company shall claim all deductions and make such elections for federal or state income tax purposes which the Executive Committee reasonably believes will produce the most favorable tax results for the Member.

**10.5     Bank Accounts**.  All funds of the Company shall be deposited in a separate bank, money market or similar account or accounts approved by the Executive Committee and in the name of the Company.  Withdrawals therefrom shall be made only by Persons, and for purposes, authorized by the Executive Committee.

## ARTICLE XI     <u>Representations and Warranties of Beal</u>.

Beal represents, warrants and covenants as follows:

**11.1**   This section has been intentionally omitted.

**11.2     Authorization and Enforceability**.  Beal has the full power and authority to make, execute, deliver and perform this Agreement, and the execution, delivery and performance of this Agreement by Beal has been duly authorized by all necessary action, including, if necessary, member approval.  This Agreement has been duly executed and delivered by Beal and this Agreement constitutes, when executed, the legal, valid and binding obligation of Beal enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws relating to creditors' rights generally.

**11.3     No Violation of Laws or Agreements**.  The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated by this Agreement and the compliance with the terms, conditions and provisions of this Agreement by Beal will not, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of a material benefit under, or result in the creation of any lien upon any of the business, assets or properties of Beal under, any provision of (A) any note, bond, mortgage, indenture, license, lease, contract, commitment, agreement or arrangement to which Beal is a party, or (B) any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Beal or the business assets or properties of Beal.

**11.4   Consents.** No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or authority, is required to be obtained or made, by or with respect to, Beal in connection with the execution and delivery of this Agreement or the consummation by Beal of the transactions contemplated hereby.

## ARTICLE XII   <u>Representations and Warranties of JPOW.</u>

**12.1   Organization, Qualification.** JPOW is a limited liability company duly organized and validly existing under the laws of the State of New Jersey. JPOW has all requisite power and authority to carry on its business as and where presently being conducted.

**12.2   Authorization and Enforceability.** JPOW has the full power and authority to make, execute, deliver and perform this Agreement, and the execution, delivery and performance of this Agreement by JPOW has been duly authorized by all necessary action, including, if necessary, member approval. This Agreement has been duly executed and delivered by JPOW and this Agreement constitutes, when executed, the legal, valid and binding obligation of JPOW enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws relating to creditors' rights generally.

**12.3   No Violation of Laws or Agreements.** The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated by this Agreement and the compliance with the terms, conditions and provisions of this Agreement by JPOW will not, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of a material benefit under, or result in the creation of any lien upon any of the business, assets or properties of PGS under, any provision of (A) its Certificate of Formation or other company documents, or (B) any note, bond, mortgage, indenture, license, lease, contract, commitment, agreement or arrangement to which JPOW is a party, or (C) any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to JPOW or the business assets or properties of JPOW.

**12.4   Consents.** No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or authority, is required to be obtained or made, by or with respect to, JPOW in connection with the execution and delivery of this Agreement or the consummation by JPOW of the transactions contemplated hereby.

## ARTICLE XIII   <u>Non-Disclosure.</u>

**13.1   Company Information.** From the date of this Agreement, the Member hereby agrees to use only on behalf of the Company and not otherwise disclose information regarding the business and finances of the Company until the later of the dissolution of the Company or the extinguishment of the Member's obligations under Section 9.2, except that the Member may disclose such confidential information of the Company at any time to:

   (a) a regulatory or judicial authority when given under appropriate confidentiality arrangements; and

   (b) Affiliates of the Member except those Affiliates which from time to time compete with the Company.

  After the later of dissolution of the Company or the extinguishment of the Member's obligations under Section 9.2, no restrictions on disclosure or use of such Company information shall continue.

  **13.2** Intentionally Omitted

  **13.3** **Generally Available Information.**  Notwithstanding Section 13.1, the obligation of non-disclosure shall not apply to any information relating to the business and finances of the Company which is or becomes generally available to the public through no fault of any Person owing an obligation of non-disclosure or confidentiality to the Company.

  **13.4** **Breach and Recourse.**  The Member hereby acknowledges and agrees that a breach of this covenant of non-disclosure may cause immediate and irreparable injury to the Company and will authorize recourse by the Company to injunction and/or specific performance, as well as all other available legal or equitable remedies.

## ARTICLE XIV <u>Arbitration</u>.

  **14.1** **Resolution of Disputes by Arbitration and Selection of Arbitrators**.  Any and all good faith differences and disputes of whatsoever nature arising out of this Agreement shall be resolved and finally settled by binding arbitration.  The arbitrator shall be qualified by education, knowledge, and experience to resolve the difference or dispute.

  **14.2** **Jurisdiction of Arbitrators and Rules Applied to Arbitration**.  The jurisdiction of the arbitrator will be limited to the issue(s) referred to arbitration, and the arbitration shall be conducted pursuant to the rules of the American Arbitration Association and the substantive laws of New Jersey; provided, however, that should there be any conflict between such guidelines and the procedures set forth in this Agreement, the terms of this Agreement shall control.

  **14.3** **Enforcement**.  Enforcement of the award may be entered in any court having jurisdiction over the Members.

## ARTICLE XVI <u>Miscellaneous Provisions</u>.

  **15.1** **Notices.**  Any notice, demand or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or if sent by registered or certified mail, postage and charges prepaid, return

receipt requested, or by overnight courier of national reputation or transmitted by telecopy with evidence of the telephone number to which sent. in each case addressed to the Member's and/or Company's address or telecopier number, as appropriate, which is set forth in the books and records of the Company. Any such notice shall be deemed to be given as of the date so delivered or telecopied if delivered or telecopied during regular business hours, as of the next business day if delivered by overnight courier or delivered or telecopied after regular business hours, and if sent by mail, three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

**15.2    Governing Law.** Except as required by the Act, this Agreement and all questions with respect to its construction, enforcement or interpretation, the rights and obligations of the parties hereto, or the formation, administration, or termination of the Company shall be governed by the laws of the State of New Jersey without regard to any conflict of law rules of general application.

**15.3    Execution of Additional Instruments.** The Member hereby agrees to execute such documents or instruments as may be necessary to comply with applicable laws, rules, or regulations.

**15.4    Construction.** Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the neuter gender shall include the masculine and feminine genders and vice versa.

**15.5    Headings.** The headings in this Agreement are for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any of its provisions.

**15.6    Waivers.** The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not constitute a waiver of any subsequent violation or of the right to so insist.

**15.7    Rights and Remedies Cumulative** The rights and remedies provided by this Agreement are cumulative, and also are provided in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

**15.8    Severability.** Any provision of this Agreement that is invalid, illegal, or unenforceable in any jurisdiction shall be ineffective only in such jurisdiction and only to the extent of such invalidity, illegality, or unenforceability, and without rendering ineffective the remaining provisions of the Agreement in any jurisdiction.

**15.9    Successors and Assigns.** The rights, duties and obligations of a Member under this Agreement may not be assigned without the prior written consent of the other Member which may be given or withheld in its sole discretion. To the extent that such consent is given, each and all of the covenants, terms, provisions, and agreements contained in this Agreement shall be binding upon and inure to the benefit their successors in interest.

**15.10   No Third Party Beneficiaries.**  None of the provisions of this Agreement shall be construed to be for the benefit of or enforceable by any Person other than the parties hereto and, to the extent permitted by this Agreement, their successors in interest.

**15.11   Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

**15.12   Facsimile Signatures.**  A facsimile signature may serve as an original, and that the Statute of Frauds will be waived as to any claim associated with transmittal or acceptance of the facsimile signature.

**15.13   Entire Agreement.**  This Agreement, including any exhibits, is the entire agreement between the parties regarding the subject matter of the formation and operation of the limited liability company.  It supersedes any other representations or agreements, whether oral or written.

**IN WITNESS WHEREOF**, the parties have executed this Agreement to be effective the date first noted above.

**ERICA L. BEAL**

By: _Erica L Beal_____

Date of Execution: ___9/23/19_____

**JINGOLI POWER, LLC**

By: _____

Name: Brian J. Gibson

Title: President

Date of Execution: __9/24/2019_____

-29-

# EXHIBIT "B"



AMERICAN ARBITRATION ASSOCIATION®  INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☒
There is no additional administrative fee for this service.

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

Name of Respondent: Erica L. Beal

Address: 6347 Park Ridge Boulevard

| City: San Diego | State: California ▼ | Zip Code: 92120 |
|---|---|---|

| Phone No.: 619-440-4444 | Fax No.: 619-440-4907 |
|---|---|

Email Address: mbluemel@mcdougallawfirm.com

Name of Representative (if known): Mark-Robert Bluemel, Esq.

Name of Firm (if applicable): McDougal Boehmer Foley Lyon Mitchell & Erickson

Representative's Address: 8100 La Mesa Boulevard, Suite 200

| City: La Mesa | State: California ▼ | Zip Code: 91942 |
|---|---|---|

| Phone No.: 619-440-4444 | Fax No.: 619-440-4907 |
|---|---|

Email Address: mbluemel@mcdougallawfirm.com

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

See attached.

Dollar Amount of Claim: $ 700,000.00

Other Relief Sought: ☒ Attorneys Fees ☒ Interest ☒ Arbitration Costs ☐ Punitive/Exemplary
☒ Other: Dissolution of a New Jersey limited liability company.

Amount enclosed: $ To be paid upon filing

In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☒ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

An Arbitrator with experience and knowledge in commercial disputes and a background in construction.

Hearing locale: New Jersey

(check one) ☒ Requested by Claimant ☐ Locale provision included in the contract



AMERICAN ARBITRATION ASSOCIATION®  |  INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

## COMMERCIAL ARBITRATION RULES
## DEMAND FOR ARBITRATION

| Estimated time needed for hearings overall: | hours or 2 | | days |
|---|---|---|---|

**Type of Business:**

Claimant: Jingoli Power, LLC | Respondent: Erica L. Beal

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?
No.

| Signature (may be signed by a representative): | Date:
June 16, 2023 |
|---|---|

Name of Claimant: Jingoli Power, LLC

Address (to be used in connection with this case): 100 Lenox Drive, Suite 100

| City: Lawrenceville | State: New Jersey ▼ | Zip Code: 08648 |
|---|---|---|
| Phone No.: 609-896-3111 | Fax No.: 888-318-7886 | |

Email Address: RZoller@eckertseamans.com and KMartin@eckertseamans.com

Name of Representative: Robert P. Zoller, Esq.

Name of Firm (if applicable): Eckert Seamans Cherin & Mellott, LLC

Representative's Address: Princeton Pike Corporate Ctr, 2000 Lenox Dr., Suite 203

| City: Lawrenceville | State: New Jersey ▼ | Zip Code: 08648 |
|---|---|---|
| Phone No.: 609-989-5028 | Fax No.: 609-392-7956 | |

Email Address: RZoller@eckertseamans.com and KMartin@eckertseamans.com

To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

## AMERICAN ARBITRATION ASSOCIATION

In the Matter of Arbitration Between

JINGOLI POWER, LLC,

      Claimant,

      and

ERICA L. BEAL,

      Respondent.

Claim No. _____

## STATEMENT OF CLAIM

Claimant, Jingoli Power, LLC ("Jingoli"), by and through its counsel, Eckert Seamans Cherin & Mellott, LLC, hereby asserts this Statement of Claim against Respondent, Erica L. Beal ("Beal"), and states as follows:

### SUMMARY

1.     This is an action by Jingoli to resolve Beal's breach of the September 10, 2019 Operating Agreement (the "Operating Agreement") of AVIVV, LLC ("AVIVV" or "Company"), a two member New Jersey limited liability company. Beal is a majority member of AVIVV, and Jingoli is a minority member. Beal has breached her fiduciary duties by conducting self-serving activities that are contrary to the best interests of the AVIVV, and demanding cash distributions from the Company without any regard to the terms of the Operating Agreement. Beal's breaches have caused AVIVV and Jingoli considerable harm, including but not limited to lost profits, loss of opportunity, loss of good will, conflicts of interest and employment risk exposure. Jingoli seeks to settle outstanding distributions to be made under the Operating Agreement, dissolve AVIVV, and wind down the operations of AVIVV.

**PARTIES**

2.  Jingoli is a New Jersey limited liability company. It is a member of AVIVV, having a 49% interest in the Company.

3.  Beal is an individual residing in the State of California. She is a member of AVIVV, having a 51% interest in the Company.

**JURISDICTION**

4.  AAA has jurisdiction to hear and decide this controversy pursuant to Article 14 of the Operating Agreement. Article 14 of the Operating Agreement requires that "[a]ny and all good faith differences and disputes of whatsoever nature arising out of this Agreement shall be resolved and finally settled by binding arbitration . . . and, the arbitration shall be conducted pursuant to the rules of the American Arbitration Association and the substantive laws of New Jersey[.]"

**STATEMENT OF FACTS**

5.  On September 10, 2019, Jingoli and Beal executed the Operating Agreement of AVIVV. (See Operating Agreement of AVIVV attached as Exhibit "A").

6.  Pursuant to Article 4 of the Operating Agreement, Jingoli has a 49% interest in AVIVV, and Beal has a 51% interest in AVIVV.

7.  Article 3.1 of the Operating Agreement provides that AVIVV was formed by Jingoli and Beal to provide project execution services for private and public utility projects, specifically electric transmission, substation, and distribution projects.

8.  Jingoli is tasked with all back-office functions for AVIVV, including but not limited to payroll, employee benefits, and accounting.

9.  Beal serves as AVIVV's Chief Executive Officer, and is tasked with the day-to-day operations and business development of the Company.

2

10.     In December of 2021, an investigation revealed that Beal was not acting in the best interests of AVIVV.

11.     Specifically, the investigation revealed that a former employee of AVIVV had formed two competing companies, Revitalize Group, LLC ("Revitalize") and Malveaux & Co., LLC ("Malveaux"), with Beal funding 100% of both companies, having a 50% interest in both companies, and being an officer of both companies.

12.     Additionally, the investigation revealed that Beal and AVIVV's former employee formed a third non-profit company, Girls Love STEM ("GLS"), with Beal funding 100% of the company, and being an officer and board member of the company.

13.     Under Beal's direction, the former employee was conducting activities for Revitalize, Malveaux and GLS during working hours at AVIVV and using Company resources.

14.     Beal did not disclose the formation of Revitalize, Malveaux and GLS or their activities to Jingoli.

15.     Beal violated her fiduciary duties owed to AVIVV by permitting an AVIVV employee to use Company time and resources to further personal business interests and activities which compete with the activities of AVIVV.

16.     Beal's failure to disclose the formation of Revitalize, Malveaux and GLS  and the relationships associated with them have caused a conflict of interest, employment risk exposure and loss of profit of AVIVV.

17.     Additionally, Beal has acted in a self-serving manner and inconsistent with AVIVV's policies in other various ways, including, but not limited, to expensing personal items and services to AVIVV, seeking charitable contributions from AVIVV employees, recording

3

conversations without consent of the party, and using AVIVV employee images without their permission.

18.     Pursuant to Article 9 of the Operating Agreement, on September 14, 2022, Jingoli sent a Notice of Violation to Beal regarding her material breach of her fiduciary duties. As of that date, Beal's actions had costed AVIVV over $100,000.00. (See September 14, 2022 correspondence attached as Exhibit "B").

19.     Beal never provided a meaningful response to the September 14, 2022 Notice of Violation.

20.     Beal's breaches of her fiduciary duties prompted Jingoli to send a second correspondence to Beal on October 7, 2022, wherein Jingoli sought dissolution of AVIVV in accordance with Article 9 of the Operating Agreement. (See October 7, 2022 correspondence attached as Exhibit "C").

21.     Beal never provided a response to the October 7, 2022 correspondence.

22.     Over the course of the last eighteen (18) months, Beal has not provided any new business for AVIVV.

23.     However, the Company generates revenue through a subcontract relationship with Jingoli for services to San Diego Gas & Electric.

24.     On May 25, 2023, Jingoli informed AVIVV's members that AVIVV was operating with enough funds for a $700,000.00 total distribution, with 51% being available to Beal ($357,000.00), and 49% being available to Jingoli ($343,000.00). A request was made to the AVIVV members for a vote to approve the distribution.

25.     Inconsistent with the terms of the Operating Agreement, on June 9, 2023, Beal demanded that she receive the full distribution of $700,000.00.

4

26.     Article 4 of the Operating Agreement clearly provides that all profits and losses are distributed in accordance with percentage of ownership.

27.     In light of Beal's continued breach of her fiduciary duties to AVIVV, along with the dispute as to the distribution of profits, Jingoli has been damaged in an amount to be determined during the arbitration and seeks dissolution of AVIVV, a wind down of AVIVV's operations, and distribution of profits in accordance with the Operating Agreement.

## COUNT I – Breach of Fiduciary Duty

28.     The assertions contained in paragraphs 1 through 27 are incorporated herein by reference with the same force and effect as if set forth in full.

29.     As a member and officer of AVIVV, Beal has a fiduciary duty to conduct herself in the best interest of AVIVV and the other member, Jingoli.

30.     Beal has violated her fiduciary duties owed to AVIVV by acting in a self-serving manner and permitting an AVIVV employee to use Company time and resources to further personal business interests and activities which compete with AVIVV.

31.     As a result of Beal's actions, Jingoli is damaged in an amount to be determined during the arbitration.

## COUNT II – Breach of Operating Agreement

32.     The assertions contained in paragraphs 1 through 31 are incorporated herein by reference with the same force and effect as if set forth in full.

33.     Under the Operating Agreement, all profits and losses are distributed in accordance with percentage of ownership, which is 51% to Beal and 49% to Jingoli.

34.     Beal's directive to be paid 100% of the profits of AVIVV is in violation of the terms of the Operating Agreement.

5

35.     As a result of Beal's actions, Jingoli is damaged in an amount to be determined during the arbitration.

### COUNT III – Dissolution

36.     The assertions contained in paragraphs 1 through 35 are incorporated herein by reference with the same force and effect as if set forth in full.

37.     As a member and officer of AVIVV, Beal has a fiduciary duty to conduct herself in the best interest of AVIVV and the other member, Jingoli.

38.     Beal has violated her fiduciary duties owed to AVIVV by acting in a self-serving manner and permitting an AVIVV employee to use Company time and resources to further personal business interests and activities which compete with AVIVV.

39.     Under the Operating Agreement, all profits and losses are distributed in accordance with percentage of ownership, which is 51% to Beal and 49% to Jingoli.

40.     Beal's directive to be paid 100% of the profits of AVIVV is in violation of the terms of the Operating Agreement.

41.     As a result of Beal's actions, Jingoli seeks an award providing for the dissolution and winding down of AVVIV pursuant to the terms of the Operating Agreement and the New Jersey Revised Uniform Limited Liability Company Act, N.J.S.A. § 42:2C-1, et seq.

### DEMAND

WHEREFORE, Jingoli seeks the following in this arbitration:

(i)     dissolution of AVIVV;

(ii)    a wind down of AVIVV's operations;

(iii)   distribution of AVIVV's profits in accordance with the Operating Agreement;

(iv)    damages in an amount to be determined at arbitration;

6

(v)     interest on any award at the maximum rate permitted by law;

(vi)    attorneys' fees; and,

(vii)   such other and further relief as the Arbitrator deems just and appropriate.


Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC
Princeton Pike Corporate Center
2000 Lenox Drive, Suite 203
Lawrenceville, New Jersey 08648


By: _____

Robert P. Zoller, Esq.
Karlee M. Martin, Esq.

Dated: June 16, 2023

7

# EXHIBIT "A"

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF

## AVIVV, LLC

This Limited Liability Company Operating Agreement (including the appendices attached hereto, the "Agreement") of AVIVV, LLC, a New Jersey multi-member limited liability company ("AVIVV" or "Company"), is made as of the 10th day of September, 2019, by and among Erica L. Beal ("Beal") and Jingoli Power, LLC, a New Jersey limited liability company ("JPOW"). Beal and JPOW are collectively referred to herein as "Members" and individually as a "Member".

### ARTICLE I     Definitions.

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I unless otherwise expressly provided.

1.1     **"Act"** means the New Jersey Limited Liability Company Act, as amended.

1.2     **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Operating Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)     Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1 (b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.3     **"Affiliate"** means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person.  "Controlled Affiliate" means, with respect to any Person: (a) any Person directly or indirectly controlled by such Person, and (b) any Person a majority of whose equity securities are owned directly or indirectly by such Person.  For purposes of these definitions, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.4     **"Agreement"** means the Limited Liability Company Operating Agreement of the Company made by Erica L. Beal and Jingoli Power, LLC, as the Members of the Company.

**1.5** "**Assets**" has the meaning defined in Section 3.1 (a).

**1.6** "**Business**" has the meaning given that term in Section 3.1.

**1.7** "**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Person in accordance with the following provisions:

(i)  To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 4.8 or 4.9 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any Property distributed to such Member.

(ii)  To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Operating Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 4.8 or 4.9 hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)  In the event any interest in the Company is transferred in accordance with the terms of this Operating Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)  In determining the amount of any liability for purposes of Sections 1.7(i) and 1.7(ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Operating Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.7041 (b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Executive Committee shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Executive Committee may make such modification, provided that is not likely to have a material effect on the amounts distributable to any Member pursuant to Article IX hereof upon the dissolution of the Company.  The Executive Committee also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Regulations Section 1.7041(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event

-2-

unanticipated events might otherwise cause this Operating Agreement not to comply with Regulations Section 1.7041(b).

**1.8**  **"Capital Contribution"** means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Percentage Interest held by such Member pursuant to the terms of this Operating Agreement. The principal amount of a  promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or by a Person related to the maker of the note within the meaning of Regulations Section 1.7041(b)(2)(ii)(c)) shall not be included in the Capital Contribution of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.7041(b)(2)(iv)(d)(2).

**1.9**  **"Company Minimum Gain"** refers to "partnership minimum gain" as set forth in Regulations Sections 1.7042(b)(2) and 1.7042(d).

**1.10**  **"Certificate of Formation"** means the Certificate of Formation of the Company as filed with the Secretary of State of New Jersey, as the same may be amended or restated from time to time.

**1.11**  **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

**1.12**  **"Company"** means AVIVV, LLC, a New Jersey Limited Liability company.

**1.13**  This section has been intentionally omitted.

**1.14**  **"Controlled Affiliate"** has the meaning defined in Section 1.3.

**1.15**  **"Covered Person"** is any Member, Executive Committee member, employee or agent of the Company.

**1.16**  **"Depreciation"** means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Executive Committee.

**1.17**  **"Effective Date"** means the date on which the Certificate of Formation is filed with the New Jersey Secretary of State, or such later date as may be specified in the Certificate of Formation.

**1.18** "**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Members;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Executive Committee, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Regulations Section 1.7041(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Executive Committee reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)   The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Executive Committee; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Sections 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.7041 (b)(2)(iv)(m) and Sections 2.01(42)(vi) and 9.03(e) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 1.18(iv) to the extent the Executive Committee determines that an adjustment pursuant to Section 1.18(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.18(iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to these Sections 1.18(i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

**1.19**   This section has been intentionally omitted.

**1.20**   "**Entity**" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association, or any foreign trust, or foreign business organization.

**1.21**   "**Event of Dissolution**" has the meaning defined in Section 9.1.

-4-

**1.22** **"Executive Committee"** has the meaning defined in Section 5.2(a).

**1.23** **"Fiscal Year"** means (i) the period commencing on the Effective Date and ending on the immediately succeeding December 31, and (ii) any subsequent twelve month period commencing on January 1 and ending on December 31, and any portion of said subsequent period for which the Company is required to allocate Profits, Losses, and other items of Company income, gain, loss, or deduction.

**1.24** This section has been intentionally omitted.

**1.25** This section has been intentionally omitted.

**1.26** **"Member"** or **"Members"** means Erica L. Beal and/or Jingoli Power, LLC.

**1.27** This section has been intentionally omitted.

**1.28** **"Member Nonrecourse Debt"** Refers to "partner nonrecourse debt" as set forth in Regulations Section 1.7042(b)(4).

**1.29** **"Member Nonrecourse Debt Minimum Gain"** means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.7042(i)(3).

**1.30** **"Member Nonrecourse Deductions"** Refers to "partner nonrecourse deductions" as set forth in Regulations Sections 1.7042(i)(1) and 1.7042(i)(2).

**1.31** **"Net Cash From Operations"** means the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Executive Committee.  "Net Cash From Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

**1.32** **"Nonrecourse Deductions"** has the meaning set forth in Regulations Section 1.7042(b)(3).

**1.33** **"Nonrecourse Liability"** has the meaning set forth in Regulations Section 1.7042(b)(3).

**1.34** **"Percentage Interest"** means, subject to Section 4.3, as to Beal having 51% of all interests in the Company and JPOW having 49% of all interests in the Company, which shall be such Member's percentage share of (i) total Profits or Losses of the Company to be allocated; (ii) the total amount of the initial and each additional capital contribution; and (iii) the total amount of each distribution.

**1.35** **"Person"** means any individual or Entity, and the executors, administrators, legal representatives, successors, and assigns of a "Person" when the context so permits.

**1.36** **"Profits and Losses"** means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.7041(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or added to such loss;

(iii)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 1.18(ii) or Section 1.18(iii) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with Section 1.16 hereof;

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required pursuant to Regulations Section 1.7041(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses;

(vii)  Notwithstanding any other provision of this Section 1.36, any items which are specially allocated pursuant to Sections 4.8 and 4.9 hereof shall not be taken into account in computing Profits or Losses; and

(viii)  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Sections 4.8 and 4.9 hereof shall be determined by applying rules analogous to those set forth in Sections 1.36(i) through 1.36(vii) above.

**1.37**  "**Property**" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

**1.38**  "**Regulations**" means Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**1.39**  "**Regulatory Allocations**" has the meaning set forth in Section 4.9 hereof.

**1.40**  This section has been intentionally omitted.

**1.41**  This section has been intentionally omitted.

**1.42**  "**Taxing Jurisdiction**" means any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

**1.43**  "**Transfer**" means, in either noun or verb form, any voluntary or involuntary transfer, sale, or other disposition.

**ARTICLE II**     **Formation, Term, Name and Status.**

**2.1**    **Formation**. The Company was formed pursuant to Section 11 of the Act, on September 10, 2019 (the "Date of Formation"), by the filing of a Certificate of Formation (the "Certificate") with the New Jersey Department of Treasury, Division of Revenue thereby establishing the Company as a New Jersey limited liability company. The Company shall be operated and shall conduct its business in accordance with the Act, except to the extent modified by the terms of this Agreement. Upon the execution of the Operating Agreement and the proper filing of the Certificate of Formation with the New Jersey Department of Treasury, Division of Revenue, Beal and JPOW shall be admitted as the Members of the Company.

**2.2**    **Term**. The term of the Company shall commence on the Effective Date and, unless sooner dissolved in accordance with this Agreement or as required by statute, shall be perpetual.

**2.3     Name.** The name of the Company is AVIVV, LLC.

**2.4     No State Law Partnership, Liability to Third Parties.** The Members intend that the Company not be a partnership (including, without limitation, a limited partnership), and that no Member be a partner or joint venture of any other Member nor assume the duties that either such status may impose, for any purposes other than federal and state tax purposes, and that this Agreement not be construed otherwise. Except to the limited extent expressly provided in Section 7.3(a), no Member shall be liable for the debts, obligations or liabilities of the Company to third parties, including under a judgment, decree or order of a court.

**2.5     Agreement, Effect of Inconsistencies with Act.** For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Operating Agreement hereby agree to the terms and conditions of this Operating Agreement, as it may from time to time be amended according to its terms. It is the express intention of the Members that this Operating Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of this Operating Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Operating Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, this Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment. The Members hereby agree that each Member shall be entitled to rely on the provisions of this Operating Agreement, and no Member shall be liable to the Company or to any Member for any action or refusal to act taken in good faith reliance on the terms of this Operating Agreement. The Members hereby agree that the duties and obligations imposed on the Members as such shall be those set forth in this Operating Agreement, which is intended to govern the relationship among the Company and the Members, notwithstanding any provision of the Act or common law to the contrary.

**2.6     Confirmation of Status, Scope of Authority.** Each Member hereby confirms and agrees to its status as a Member upon the terms and conditions set forth in this Agreement.

**2.7     Principal Office.** The principal office of the Company shall be located at 100 Lenox Drive, Suite 100, Lawrenceville, NJ 08648.

ARTICLE III     Purpose, Exclusive Dealings, and Assets.

3.1     Purpose.

(a)     The Company is being organized for the purpose of providing project execution services for private and public utility projects, specifically electric transmission, substation and distribution projects, including: (i) engineering, procurement and construction contracts; (ii) general contractor services; (iii) staff augmentation professional services; (iv) construction and project management services; and (v) any other activity to which the Members agree. (the "Business"). The Executive Committee shall have no authority to undertake any activity outside of the parameters of the Business without the approval of the Members.

(b)     In addition, the Company may engage in any act concerning any or all other business or activity that now or hereafter may be necessary, incidental, proper, advisable, or convenient to accomplish the foregoing purposes and that is not forbidden by the law of the jurisdiction in which the Company engages in that business; provided, however, that notwithstanding anything stated herein to the contrary, the Company shall not engage in any activity which would cause the Company to be a "public utility company" or a "holding company" as such terms are used in the Public Utility Holding Company Act of 1935, as amended. The Company may accomplish the purposes set forth in this Section 3.1 by entering into any contract, subject to the provisions of this Agreement, or taking any other action permitted under the Act and any other applicable law and necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

(c)     Any Member may engage in or possess an interest in other business ventures of every nature and description, independently or with others, and neither the Company nor the Members shall have any right by virtue of this Agreement in such other business ventures or to the income or profits derived there from.

(d)     The Company exists only for the purposes specified in this Article III, and may not conduct any business other than the Business without the approval of the Members. Furthermore, notwithstanding the provisions of this Agreement, the Company shall not do business in any jurisdiction that would jeopardize the limitation on liability afforded to the Members under the Act or this Operating Agreement.

3.2     **Responsibility for Warranties and System Support.** No Member shall be responsible for any warranties or guarantees provided by the Company. The Company shall be solely responsible for any warranties or guarantees arising in the operation of the Business.

ARTICLE IV     Member Contributions, Allocations, Distributions and Taxes.

-9-

**4.1     Initial Capital Contribution**. The names, addresses, initial Capital Contributions, and Percentage Interests of the Members are set forth below. The initial Capital Contributions shall be made concurrently with the last execution of this Operating Agreement. The Members acknowledge that the interests in the Company have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the Members without appropriate registration or the availability of an exemption from such requirements.

| | | |
|---|---|---|
| ERICA L. BEAL<br>5173 Waring Road<br>Suite 87<br>San Diego, CA  92120 | $1,501 | 51% Percentage Interest |
| JINGOLI POWER, LLC<br>100 Lenox Drive<br>Suite 100<br>Lawrenceville, NJ 08648 | $1,500 | 49% Percentage Interest |

**4.2     Capital Accounts**. A Capital Account shall be established and maintained for the Members.

**4.3     Additional Capital Contributions**.

Additional monetary Capital Contributions may be requested by the Executive Committee in its reasonable discretion as may be needed to cover ongoing operating expenses or to cover losses the Company has incurred. Such additional monetary Capital Contributions shall be payable in cash in proportion to the Percentage Interests of the Members. Except as stated above, no Member shall be required to make any additional monetary capital contributions.

**4.4     Loans**. If any Member shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution of the Company but shall be a debt due from the Company. The amount of such loan or advance by a lending Member shall be repayable out of the Company's cash and shall bear reasonable interest at the rate agreed between the Company and the lending Member.

**4.5     Other Matters**.

(a)     Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein.

(b)     No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except as otherwise provided in this Operating Agreement.

-10-

(c)   Each Member waives any and all rights that it may have to maintain an action for partition of the Company's Property.

**4.6    Profits**. After giving effect to the special allocations set forth in Sections 4.8 and 4.9 hereof, Profits for any Fiscal Year shall be allocated to the Members.

**4.7    Losses.**

(a)   After giving effect to the special allocations set forth in Sections 4.8 and 4.9 hereof, Losses for any Fiscal Year shall be allocated to the Members.

(b)   The Losses allocated pursuant to Section 4.7(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing the Members to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.

**4.8    Special Allocations**. The following special allocations shall be made in the following order:

(a)   <u>Minimum Gain Chargeback</u>. Except as otherwise provided in Regulations Section 1.7042(f), notwithstanding any other provision of this Article IV, if there is a net decrease in Company Minimum Gain during any Company Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.7042(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.7042(f)(6) and 1.70420(2). This Section 4.8(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.7041 (f) and shall be interpreted consistently therewith.

(b)   <u>Member Minimum Gain Chargeback</u>. Except as otherwise provided in Regulations Section 1.7041 (i)(4), notwithstanding any other provision of this Article IV, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.7042(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.7042(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.7042(i)(4) and 1.70420(2). This Section 4.8(b) is intended to comply with the minimum gain chargeback

requirement in Regulations Section 1.7042(i)(4) and shall be interpreted consistently therewith.

(c) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Members.

(d) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member.

(e) Code Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Regulations Sections 1.7041(b)(2)(iv)(m)(2) or 1.7041(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Member.

(f) Allocations Relating to Taxable Issuance of Percentage Interests. Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an interest in the Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Operating Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

(g) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Sections 1.7041(b)(2)(ii)(d) (4), 1.704(b)(2)(ii)(d)(5), or 1.7041(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.8(g) shall be made only if and to the extent that such Member would have an adjusted Capital Account Deficit after all other allocations provided for in this Section 4.8 have been tentatively made as if this Section 4.8(g) were not included in this Operating Agreement.

**4.9 Curative Allocations**. The allocations set forth in Sections 4.8(a), 4.8(b), 4.8(c), 4.8(d), 4.8(e) and 4.8(g) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.9. Therefore, notwithstanding any other provision of this Article IV (other than the Regulatory Allocations), the Executive Committee shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible,

-12-

equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Operating Agreement and all Company items were allocated pursuant to Sections 4.6 and 4.7 hereof. In exercising its discretion under this Section 4.9, the Executive Committee shall take into account future Regulatory Allocations under Sections 4.8(a) and 4.8(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 4.8(c) and 4.8(d).

**4.10   Other Allocation Rules**.

(a)   The Members are aware of the income tax consequences of the allocations made by this Article IV and hereby agrees to be bound by the provisions of this Article IV in reporting their shares of Company income and loss for income tax purposes.

(b)   For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Executive Committee using any permissible method under Code Section 706 and the Regulations thereunder.

(c)   Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Regulations Section 1.7523(a) (3), the Members' interests in Company profits are in proportion to their Percentage Interests.

(d)   To the extent permitted by Regulations Section 1.7042(h)(3), the Executive Committee shall endeavor not to treat distributions of Net Cash from Operations as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt.

**4.11   Tax Allocations: Code Section 704(c)**. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with Section 1.18 hereof).

In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 1.18 hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Executive Committee in any manner that reasonably reflects the purpose and intention of this Operating Agreement. Allocations pursuant to this Section 4.11 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Operating Agreement.

**4.12    Tax Characterization and Returns**.

(a)    The Members acknowledge that the Company will be treated as a "partnership" for federal and State of New Jersey state tax purposes. All provisions of this Operating Agreement and the Company's Articles of Organization are to be construed so as to preserve that tax status.

(b)    In accordance with Section 10.3, within ninety (90) days after the end of each Fiscal Year, the Executive Committee will cause to be delivered to each person who was a Member at any time during such Fiscal Year a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of each Member's federal or state income tax (or information) returns, including a statement showing each Member's share of income, gain or loss, and credits for the Fiscal Year.

**4.13    Tax Elections**. The Executive Committee may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company, including the election referred to in Code Section 754 to adjust the basis of Company assets.

**4.14    Taxes of Taxing Jurisdictions**. To the extent that the laws of any Taxing Jurisdiction require, each Member (or such Members as maybe required by the Taxing Jurisdiction) will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest, and penalties assessed on such income. If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income.

The Tax Partner on behalf of the Executive Committee, where permitted by the rules of any Taxing Jurisdiction, may file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

**4.15    Tax Matters Partner**. JPOW is initially designated as the "tax matters partner" of the Company pursuant to Code Section 321 (a)(7). Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223. Any Member who is designated tax matters partner may not take any action contemplated by Code Sections 6222 through 6232 without the consent of the other Member.

-14-

## ARTICLE V   Management.

**5.1**   **Management by the Members**.  The business and affairs of the Company shall be directed by its Members in accordance with the provisions of this Agreement as set forth below.

**5.2 Executive Committee**.

(a)   The Company shall be managed by and at the direction of its Members, Beal and JPOW.  The Company shall be managed through a committee consisting of Beal and one representative of JPOW (the "Executive Committee").  Each meeting of the Executive Committee shall be deemed a meeting of the Members.  Meetings of the Members (apart from meetings of the Executive Committee) are neither necessary nor required.

(b)   From time to time, the Members shall elect its representatives to the Executive Committee, and such election shall be communicated in writing to the Company.  At the time of formation, Beal is a representative and JPOW names Brian J. Gibson as its representative.

(c)   The Executive Committee shall have the authority to manage and establish policies and strategies of the Company including, without limitation, the authority to:

(i)   enter into any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance and operation of the property of the Company, or in connection with managing the affairs of the Company, including amendments to this Agreement and the Certificate of Formation in accordance with the terms of this Agreement;

(ii)   allocate and distribute Profits and Losses to Members in accordance with their Percentage Interests;

(iii)   establish an Operating Committee, if desired, establish and modify Operating Committee Procedures from time to time;

(iv)   establish reserves from Profits which otherwise would be distributed to Members;

(v)   borrow money and issue evidence of indebtedness necessary, convenient, or incidental to the accomplishment of the purpose of the Company; and secure the same by mortgage, pledge, or other lien on any property or asset of the Company;

(vi)   prepay in whole or part, refinance, recast, increase, modify or extend any liabilities affecting the property of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such property;

-15-

(vii)   invest, manage, and distribute Company funds to the Members in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement, including but not limited to opening and maintaining Company bank accounts and authorizing signatories with respect thereto;

(viii)   employ accountants, legal counsel, managing agents and other Persons (including but not limited to Affiliates of Members, subject to Section 6.1 of the Agreement) to perform service for the Company and to compensate them from Company funds;

(ix)   make any and all elections for federal, state, and local tax purposes including, without limitation, any election, if permitted by applicable law: (A) to adjust the basis of property of the Company pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with Company distributions; (B) to extend the statute of limitations for assessment of tax deficiencies against Members with respect to adjustments to the Company's federal, state, or local tax returns; and (C) to the extent provided in Code Sections 6221 through 6231, to represent the Company and its Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and its Members, and to file any tax returns and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company or the Members;

(x)   institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(xi)   engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to property of the Company) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the Act;

(xii)   take, or refrain from taking, all actions not expressly proscribed or limited by or addressed in this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company, including but not limited to the establishment, maintenance, and expenditure of reserves to provide for working capital, debt service, and such other purposes as it may deem necessary or advisable;

(xiii)   sell all or substantially all of the assets of the Company;

-16-

(xiv)   merge or consolidate the Company;

(xv)   mortgage or encumber all or substantially all of the assets of the Company;

(xvi)   approve the Company's budget;

(xvii)   vote to dissolve the Company;

(xviii)   vote to seek bankruptcy protection for the Company; and

(xix)   distribute excess cash to the Members.

(d)   Any decision or act of the Executive Committee taken in accord with the provisions of this Agreement shall control and bind the Company.

(e)   Any Member may replace any or all of its representatives on the Executive Committee at any time.

**5.3   Decisions of the Executive Committee.**   All decisions of the Executive Committee require the assent of a majority of the membership interests held in the Company

**5.4   Right to Rely on Executive Committee.**

(a)   Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by any member of the Executive Committee as to:

(i)   the identity of any member of the Executive or Operating Committees or Member of the Company;

(ii)   the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Executive Committees or which are in any other manner germane to the affairs of the Company;

(iii)   the Persons who are authorized to execute and deliver any instrument or document of the Company; or

(iv)   any act or failure to act by the Company or any other matter whatsoever involving the Company or any member of the Executive Committee, or any Member of the Company.

(b)   The signature of any Member of the Executive Committee shall be sufficient to execute any document or authorize payment on behalf of the Company, provided that such action has been properly authorized by the Executive Committee.

**5.5     Designation of Officer Titles**. The Members may provide officer titles for members of the Executive Committee of the Company. The officer titles may include, but shall not be limited to, a Chairman, a President, one or more Vice Presidents, a Treasurer, a Secretary and such other officer titles as the Members decide to appoint.

The Executive Committee shall appoint and elect, and shall have the power to terminate and remove with or without cause, such officers (**"Officers"**) as it determines necessary or expedient in carrying out the Company's business and affairs. Such Officers shall have such duties, responsibilities and authority as shall be delegated to each of them by the Executive Committee. Other Officers may from time to time be elected by the Executive Committee and be given such titles, duties and responsibilities as are commensurate with their duties and responsibilities as determined by the Executive Committee. The Executive Committee shall have authority to fix the compensation of, and to enter into employment agreements with, any Officer of the Company on such terms as the Executive Committee shall determine in each individual case in its sole and absolute discretion.

As of the date hereof, the Company shall have an Officer that is designated as the Managing Partner. Beal shall be the initial Managing Partner. The Managing Partner, subject to the direction of the Executive Committee, shall have general charge of the business, affairs and property of the Company and general supervision of its other Officers and agents. Unless otherwise prescribed by the Executive Committee, the Managing Partner shall have full power and authority on behalf of the Company to attend, act and vote at any meeting of security holders of any corporations, partnerships, limited liability companies or other business entities in which the Company may hold securities. At such meeting(s), the Managing Partner shall possess and may exercise any and all rights and powers incident to the ownership of such securities which the Company might have possessed and exercised if it had been present. The Managing Partner shall have authority to sign and execute in the Company name all appropriate agreements, mortgages, bonds, contracts and other instruments, except in cases in which the signing or execution thereof shall be expressly delegated by the Executive Committee to some other officer or agent of the Company. The Executive Committee may from time to time confer like powers and authority upon any other person or persons.

The Managing Partner has established the following Officer positions:

> Chief Executive Officer: Erica L. Beal
> President: Brian J. Gibson

Only the Managing Partner may amend the appointment of the Officers.

**5.6     Functioning of the Executive Committee**

(a)     Quorum and Voting. The majority of membership interests must be represented at a meeting of the Executive Committee in order to have a quorum for the

-18-

conducting of business. Votes shall be determined based on percentage of membership interests held and all decisions are by majority vote

(b) Chairman. One of the members of the Executive Committee shall serve as the Chairman of the Executive Committee for a term of one year. The initial Chairman of the Executive Committee shall be Erica L. Beal.

(c) Meetings. Regular meetings of the Executive Committee shall be held as determined by the Chairman of the Executive Committee, but at least twice annually. Members of the Executive Committee may participate in a meeting of the Executive Committee by a means of a conference telephone or similar communications equipment whereby all persons participating in the meeting can hear each other and be heard sufficiently to permit contemporaneous exchange and debate. Participation in a meeting in this manner shall constitute presence in person at the meeting.

(d) Notice, Waiver, and Minutes. All members of the Executive Committee shall receive a notice of each regular meeting of the Executive Committee together with a copy of the proposed agenda for such meeting at least five days prior to a scheduled regular meeting date. The Chairman or any two members of the Executive Committee may, upon two days' notice (such notice to include a proposed agenda) to the other members of the Executive Committee, call a special meeting of the Executive Committee at any time. Attendance at any meeting of the Executive Committee (either in person or by means of conference telephone or similar communications equipment) shall constitute waiver of notice thereof. The Executive Committee shall cause minutes of its meetings to be kept which shall be open for inspection by any Member at any time.

(e) Alternate Representatives. Each member of the Executive Committee shall be entitled to appoint (and to change) an alternate representative to attend meetings of the Executive Committee in such member's place. An alternate may not be a member of the Executive Committee in his own right. An alternate representative shall not be entitled to vote in his capacity as such at any meeting at which his appointer is present.

(f) Action Without Meeting. Any action which may be taken by the Executive Committee at a meeting thereof may be taken without a meeting by the unanimous written consent of all members of the Executive Committee.

## ARTICLE VI    RESERVED

## ARTICLE VII   Liabilities, Limitation of Liabilities and Indemnification.

7.1   **Limitation of Liability of Members, and Executive Committee Members**. It is specifically understood and agreed that:

(a) a Member or Executive Committee member shall not be required to devote full time to Company business;

-19-

(b)     no doctrine similar to the doctrine of corporate opportunity shall apply with regard to the actions or activities of any Member or Executive Committee member;

(c)     except as expressly otherwise provided herein to the contrary, each Member and Executive Committee member shall be free to conduct any business or activity whatsoever, without obligation to the Company or the Member;

(d)     except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person; and

(e)     except as otherwise required by law, a Member, in its capacity as Member, shall have no liability in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed Profits of the Company, (iii) its obligation to make other payments expressly provided for in this Operating Agreement, and (iv) the amount of any distributions wrongfully distributed to it.

**7.2     Actions Beyond Scope of Agreement.** Any Member who binds or obligates the Company for any debt or liability or causes the Company to act except in accordance with the provisions of this Agreement shall be liable to the Company for any such debt, liability or act.

**7.3     Indemnification.**

(a)     To the fullest extent permitted by law, a Member (herein the "Indemnifying Member") shall INDEMNIFY and DEFEND the Company and the other Member and HOLD them HARMLESS from and against all claims, losses, costs, liabilities, damages and expenses (including, without limitation, costs of suit or proceeding and attorneys' fees) they may incur by virtue of claims brought by third parties arising out of any action of the Indemnifying Member that could obligate or bind the Company for any debt, liability or act except as such may be incurred in accordance with the provisions of this Agreement. For the avoidance of doubt, the Members agree that the indemnification provided in the immediately preceding sentence applies only to claims by third parties.

(b)     To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Operating Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions or if a judgment or other final adjudication adverse to such Covered Person establishes that the Covered Person's acts or omissions were in bad faith or involved intentional misconduct or a

-20-

knowing violation of law or that the Covered Person personally gained in fact a financial profit or other advantage to which the Covered Person is not entitled; *provided, however*, that any indemnity pursuant to this Section shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

(c)     The Company may purchase and maintain insurance, to the extent and in such amounts as the Executive Committee shall, in its sole discretion, deem reasonable, on behalf of such of the Covered Persons and other Persons as the Executive Committee shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Operating Agreement. The Company may, with the approval of the Executive Committee, enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 7.3 hereof and containing such other procedures regarding indemnification as are appropriate.

(d)     To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 7.3 hereof.

**ARTICLE VIII**     RESERVED

**ARTICLE IX**     **Dissolution and Termination.**

**9.1**     **Events of Dissolution.**  Each of the following shall each be an "Event of Dissolution":

(a)     a decision by the Executive Committee to dissolve the Company;

(b)     a material breach of this Agreement (other than a breach of Article XIII) by a Member and the continuation of such breach for 30 days after the other Member has given written notice of such breach and of its election to dissolve to the breaching Member;

(c)     the expulsion, bankruptcy (which shall mean being the subject of an order for relief under Title 11 of the United States Code), or dissolution of a Member, or occurrence of any other event that terminates the continued membership of a Member in the Company;

    (d)    a Change of Control of a Member, at the written election of either Member to dissolve where:

        (i)    for purposes of this Section 9.1 a "Change of Control" means:

           (A)    the acquisition, directly or indirectly, of 25% or more of the voting securities of a Member by any Person other than a Person who owns, directly or indirectly, 25% or more of such securities on the Effective Date, or

           (B)    the ability to elect a majority of the directors of a Member by any Person other than a Person who possesses such ability on the Effective Date; and

        (ii)    notwithstanding Section 9.1(d)(i) above, a public offering or distribution to existing shareholders of the securities of a Member or its Affiliates or a management buyout of all the shares of the securities of a Member shall not be deemed an Event of Dissolution;

    (e)    as otherwise required by the Act, including but not limited to the entry of a decree of judicial dissolution pursuant to the Act;

**9.2**    **Effect of Dissolution.**

    (a)    Upon the occurrence of an Event of Dissolution set forth in Section 9.1, the Executive Committee shall commence dissolution of the Company which shall continue solely for the purpose of winding up its affairs in an orderly manner, disposing of its Assets in a commercially reasonable manner consistent with obtaining the fair market value thereof, and satisfying the claims of its creditors and Members.

    (b)    After the occurrence of an Event of Dissolution, the obligations of each Member to offer Transaction Opportunities to the Company shall be terminated. The Executive Committee shall cause the Company's Assets to be disposed of as promptly as is consistent with obtaining the fair market value thereof (or limiting loss incurred with respect thereto).

    (c)    The Executive Committee shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and property, and shall cause the proceeds from the liquidation of the Company's property, to the extent sufficient therefore, to be applied and distributed in the following order:

        (i)    first, to the payment and discharge of all the Company's debts and liabilities to creditors other than Members or their Affiliates;

        (ii)    second, to the payment and discharge of all of the Company's debts and liabilities to Members and their Affiliates; and

(iii)  third, to the Members pro rata in accordance with their positive capital account balances, after giving effect to all contributions, distributions, and allocations for all periods.

(d)  No Member shall receive any additional compensation for any services performed pursuant to this Section 9.2. Each Member understands and agrees that by accepting the provisions of this Section 9.2 setting forth the priority of the distribution of the assets of the Company to be made upon its liquidation, such Member expressly waives any right which it, as a creditor of the Company, might otherwise have under the Act to receive distributions of assets of the Company in satisfaction of any liability of the Company, and hereby subordinates to said creditors any such right.

(e)  After an Event of Dissolution, no Member or member of the Executive Committee shall take any action that is inconsistent with, or not appropriate for, winding up the Company's business and affairs.

(f)  To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company Assets have been disposed of or distributed and the Company's risk management contracts satisfied or terminated. When that has occurred, the Members shall have no further obligations under this Agreement except under Sections 13.2, 13.3 and 13.4, which shall survive dissolution and winding up of the Company.

**9.3  Filing of Articles of Cancellation.** Upon the completion of the disposition of the Assets pursuant to Section 9.2, the Executive Committee shall (or, on the failure of the Executive Committee to act, the Member may) promptly file a Certificate of Cancellation with the office of the New Jersey Secretary of State.

**9.4  Reserve.** Notwithstanding the provisions of Section 9.2, the Executive Committee may retain such funds as it deems necessary as a reserve for any contingent liabilities or obligations of the Company, which reserve, after the passage of a reasonable period of time, shall be distributed pursuant to Section 9.2(c).

## ARTICLE X  Accounting and Bank Accounts.

**10.1  Accounting Method.** The books of the Company shall be kept using accrual accounting in accordance with generally accepted accounting principles.

**10.2  Books and Records.** The books and records of the Company shall be maintained at the office of the Member which provides bookkeeping services. Books and records shall be maintained for the longer of two years or any period required by applicable statute or regulation. In any event, the other Member, at its expense, shall have the right during ordinary business hours and upon reasonable notice to inspect and copy such books and records.

**10.3  Financial Reports.**

(a)     The Company shall cause to be prepared and delivered to the Member, financial statements of the Company in such detail and with such frequency as the Member may reasonably request, together with all information with respect to the Company necessary for the preparation of the Member's federal, state, and local income tax returns.

(b) At the Member's request, the annual financials may be audited at the expense of the Company.

**10.4    Tax Returns and Elections**. The Company shall cause to be prepared and timely filed all federal, state and local income tax returns or other returns or statements required by applicable law. The Company shall claim all deductions and make such elections for federal or state income tax purposes which the Executive Committee reasonably believes will produce the most favorable tax results for the Member.

**10.5    Bank Accounts**. All funds of the Company shall be deposited in a separate bank, money market or similar account or accounts approved by the Executive Committee and in the name of the Company. Withdrawals therefrom shall be made only by Persons, and for purposes, authorized by the Executive Committee.

**ARTICLE XI      Representations and Warranties of Beal**.

Beal represents, warrants and covenants as follows:

**11. 1**   This section has been intentionally omitted.

**11.2    Authorization and Enforceability**. Beal has the full power and authority to make, execute, deliver and perform this Agreement, and the execution, delivery and performance of this Agreement by Beal has been duly authorized by all necessary action, including, if necessary, member approval. This Agreement has been duly executed and delivered by Beal and this Agreement constitutes, when executed, the legal, valid and binding obligation of Beal enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws relating to creditors' rights generally.

**11.3    No Violation of Laws or Agreements**. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated by this Agreement and the compliance with the terms, conditions and provisions of this Agreement by Beal will not, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of a material benefit under, or result in the creation of any lien upon any of the business, assets or properties of Beal under, any provision of (A) any note, bond, mortgage, indenture, license, lease, contract, commitment, agreement or arrangement to which Beal is a party, or (B) any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Beal or the business assets or properties of Beal.

**11.4   Consents.**   No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or authority, is required to be obtained or made, by or with respect to, Beal in connection with the execution and delivery of this Agreement or the consummation by Beal of the transactions contemplated hereby.

## ARTICLE XII   Representations and Warranties of JPOW.

**12. 1   Organization, Qualification.**   JPOW is a limited liability company duly organized and validly existing under the laws of the State of New Jersey.  JPOW has all requisite power and authority to carry on its business as and where presently being conducted.

**12.2   Authorization and Enforceability.**   JPOW has the full power and authority to make, execute, deliver and perform this Agreement, and the execution, delivery and performance of this Agreement by JPOW has been duly authorized by all necessary action, including, if necessary, member approval.  This Agreement has been duly executed and delivered by JPOW and this Agreement constitutes, when executed, the legal, valid and binding obligation of JPOW enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws relating to creditors' rights generally.

**12.3   No Violation of Laws or Agreements.**   The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated by this Agreement and the compliance with the terms, conditions and provisions of this Agreement by JPOW will not, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of a material benefit under, or result in the creation of any lien upon any of the business, assets or properties of PGS under, any provision of (A) its Certificate of Formation or other company documents, or (B) any note, bond, mortgage, indenture, license, lease, contract, commitment, agreement or arrangement to which JPOW is a party, or (C) any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to JPOW or the business assets or properties of JPOW.

**12.4   Consents.**   No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or authority, is required to be obtained or made, by or with respect to, JPOW in connection with the execution and delivery of this Agreement or the consummation by JPOW of the transactions contemplated hereby.

## ARTICLE XIII   Non-Disclosure.

**13.1   Company Information.**   From the date of this Agreement, the Member hereby agrees to use only on behalf of the Company and not otherwise disclose information regarding the business and finances of the Company until the later of the dissolution of the Company or the extinguishment of the Member's obligations under Section 9.2, except that the Member may disclose such confidential information of the Company at any time to:

(a)   a regulatory or judicial authority when given under appropriate confidentiality arrangements; and

(b)   Affiliates of the Member except those Affiliates which from time to time compete with the Company.

After the later of dissolution of the Company or the extinguishment of the Member's obligations under Section 9.2, no restrictions on disclosure or use of such Company information shall continue.

**13.2**   Intentionally Omitted

**13.3**   **Generally Available Information**. Notwithstanding Section 13.1, the obligation of non-disclosure shall not apply to any information relating to the business and finances of the Company which is or becomes generally available to the public through no fault of any Person owing an obligation of non-disclosure or confidentiality to the Company.

**13.4**   **Breach and Recourse**. The Member hereby acknowledges and agrees that a breach of this covenant of non-disclosure may cause immediate and irreparable injury to the Company and will authorize recourse by the Company to injunction and/or specific performance, as well as all other available legal or equitable remedies.

## ARTICLE XIV Arbitration.

**14.1**   **Resolution of Disputes by Arbitration and Selection of Arbitrators**. Any and all good faith differences and disputes of whatsoever nature arising out of this Agreement shall be resolved and finally settled by binding arbitration. The arbitrator shall be qualified by education, knowledge, and experience to resolve the difference or dispute.

**14.2**   **Jurisdiction of Arbitrators and Rules Applied to Arbitration**. The jurisdiction of the arbitrator will be limited to the issue(s) referred to arbitration, and the arbitration shall be conducted pursuant to the rules of the American Arbitration Association and the substantive laws of New Jersey; provided, however, that should there be any conflict between such guidelines and the procedures set forth in this Agreement, the terms of this Agreement shall control.

**14.3**   **Enforcement**.   Enforcement of the award may be entered in any court having jurisdiction over the Members.

## ARTICLE XVI Miscellaneous Provisions.

**15.1**   **Notices**. Any notice, demand or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or if sent by registered or certified mail, postage and charges prepaid, return

receipt requested, or by overnight courier of national reputation or transmitted by telecopy with evidence of the telephone number to which sent. in each case addressed to the Member's and/or Company's address or telecopier number, as appropriate, which is set forth in the books and records of the Company.  Any such notice shall be deemed to be given as of the date so delivered or telecopied if delivered or telecopied during regular business hours, as of the next business day if delivered by overnight courier or delivered or telecopied after regular business hours, and if sent by mail, three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

**15.2   Governing Law.** Except as required by the Act, this Agreement and all questions with respect to its construction, enforcement or interpretation, the rights and obligations of the parties hereto, or the formation, administration, or termination of the Company shall be governed by the laws of the State of New Jersey without regard to any conflict of law rules of general application.

**15.3   Execution of Additional Instruments.** The Member hereby agrees to execute such documents or instruments as may be necessary to comply with applicable laws, rules, or regulations.

**15.4   Construction.** Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the neuter gender shall include the masculine and feminine genders and vice versa.

**15.5   Headings.** The headings in this Agreement are for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any of its provisions.

**15.6   Waivers.** The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not constitute a waiver of any subsequent violation or of the right to so insist.

**15.7   Rights and Remedies Cumulative**  The rights and remedies provided by this Agreement are cumulative, and also are provided in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

**15.8   Severability.** Any provision of this Agreement that is invalid, illegal, or unenforceable in any jurisdiction shall be ineffective only in such jurisdiction and only to the extent of such invalidity, illegality, or unenforceability, and without rendering ineffective the remaining provisions of the Agreement in any jurisdiction.

**15.9   Successors and Assigns.** The rights, duties and obligations of a Member under this Agreement may not be assigned without the prior written consent of the other Member which may be given or withheld in its sole discretion. To the extent that such consent is given, each and all of the covenants, terms, provisions, and agreements contained in this Agreement shall be binding upon and inure to the benefit their successors in interest.

**15.10    No Third Party Beneficiaries**.  None of the provisions of this Agreement shall be construed to be for the benefit of or enforceable by any Person other than the parties hereto and, to the extent permitted by this Agreement, their successors in interest.

**15.11    Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

**15.12    Facsimile Signatures**. A facsimile signature may serve as an original, and that the Statute of Frauds will be waived as to any claim associated with transmittal or acceptance of the facsimile signature.

**15.13    Entire Agreement**.  This Agreement, including any exhibits, is the entire agreement between the parties regarding the subject matter of the formation and operation of the limited liability company.  It supersedes any other representations or agreements, whether oral or written.

**IN WITNESS WHEREOF,** the parties have executed this Agreement to be effective the date first noted above.

**ERICA L. BEAL**

By: _____

Date of Execution: _____9 / 23 / 19_____

**JINGOLI POWER, LLC**

By: _____

Name: Brian J. Gibson

Title: President

Date of Execution: _____9/24/2019_____

-29-

# EXHIBIT "B"



September 14, 2022

Elysium Connections, Inc.
ATTN: Erica Beal
5173 Warning Road, Suite 87
San Diego, CA 92120

Re: Notice of Violation February 1, 2021 Consulting Agreement/Failure to Disclose

Dear Erica,

In December of 2021 an investigation revealed that a former employee of AVIVV, LLC ("AVIVV") has formed two companies, Revitalize Group, LLC ("Revitalize") and Malveaux & Co., LLC ("Malveaux"), and we recently learned through sworn testimony that you funded Revitalize and Malveaux , were aware of them, and may have been engaged in or intended to engage in activities that were contrary to the best interests of AVIVV. In addition, a third nonprofit corporation was formed, Girls Love STEM ("GLS"), with both you and Rachael Medlin as officers and board members (Revitalize, Malveaux and GLS are collectively the "Companies").  It appears that the former employee was conducting these activities during working hours at AVIVV, under your direction, and using company resources. When asked about your participation in or knowledge of said Companies, you denied knowledge of them and denied authorizing work for said Companies during AVIVV paid hours. Despite your representations, it appears that the formation of these companies and their activities were known to you and were not disclosed to Jingoli Power, LLC. As an owner and officer of AVIVV, you have a fiduciary duty to conduct yourself in the best interest of AVIVV and its other owner. Permitting an employee to use company time and resources to further personal business interests and activities that may be competitive with the activities of AVIVV, is a violation of your fiduciary duties owed to AVIVV.

To date, these outside Companies and relationships associated with them have not been fully and truthfully disclosed to the partnership causing a conflict of interest, employment risk exposure and loss of profit by the partnership, including but not limited to:

- Denial of involvement in termination Rachael Medlin for violating company policy by failing to disclose outside Companies and working during company time on the businesses. Thus, resulting in a $25,000 severance agreement and $17,000 approximately in unemployment insurance.
- The current and former employee of AVIVV, LLC, and Chief Executive Officer of Revitalize Group, LLC and Malveaux & Co., LLC, Rachael Medlin, stated under oath at the State of California Unemployment Hearing on September 7, 2022 that you were an officer of both companies and 50% owner. In addition, Ms. Medlin



100 Lenox Drive, Suite 100, Lawrenceville NJ 08648
Office: 609.896.3111 | Fax: 888.318.7886



testified that the start of said Companies were 100% funded by Erica Beal. Lastly, Ms. Medlin stated that Erica Beal as her boss and CEO of AVIVV, LLC prior to termination authorized her to work on the said Companies. A copy of the Judge's findings is attached hereto as **Exhibit A**, stating that the "claimant had been given authorization to use the employer's computers, emails and server to do work in her own business…by the CEO who was her boss." Rachael's neglect and management of ILB billing account, along with former employee Carolina Dieli, while working on the other Companies has cost AVIVV, LLC over $100,000 year to date. Both Ms. Medlin and Ms. Dieli are indicated as leadership on Malveaux & Co., LLC's website:  https://www.malveauxco.com/our-team

- For reference, the attached **Exhibit B** is a filed CA Statement of Information filed on 10/26/2021 and indicates you are a manager or Member of Revitalize.
- Also attached hereto as **Exhibit C** is the GLS CA Articles of Incorporation, which list the Elysium Connections, Inc. office address as the Business Addresses and you as the Service of Process.

Moreover, your conduct appeared to be in direct violation of disclosure obligations that you agreed to under the February 1, 2021 Consulting Agreement between Elysium Connections, Inc. and Jingoli Power, LLC. Specifically, Section 5 of the Consulting Agreement required that you disclose to Jingoli Power any interests or activities that may conflict with the best interest of Jingoli Power. The lack of disclosure violations noted herewith were done primarily during the time the Consulting Agreement was in effect.

Based on the issues noted above as confirmed through sworn testimony, Jingoli Power has determined that it no longer wishes to remain in a partnership with you and would like to work with you amicably to unwind the partnership, through (a) one partner purchasing out the other partner's interest, (b) a mutual dissolution of AVIVV or (c) some other mutually acceptable approach. We suggest a meeting or Zoom call to discuss the best path forward to unwind the partnership.

Respectfully,
**Karl D. Miller**
Chief Executive Officer –  Jingoli Power, LLC





**Exhibit A**
**Judge's Findings**



100 Lenox Drive, Suite 100, Lawrenceville NJ 08648
Office: 609.896.3111 | Fax: 888.318.7886

CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD



**SAN DIEGO OFFICE OF APPEALS**
3517 Camino Del Rio South, #100
**SAN DIEGO CA 92108-4027**

**(619) 521-3300**

| | |
|---|---|
| RACHAEL M MEDLIN<br>Claimant<br><br>JPOW CALIFORNIA, LLC<br>Account No: 111-0389<br>Employer-Appellant | Case No. **7231852**<br><br>Issue(s): 1030/32, 1256<br><br>Date Appeal Filed: 03/03/2022<br><br><br>EDD: 1800  BYB: 12/26/2021 |

**Date and Place of Hearing(s):**
(1) 09/07/2022

**Parties Appearing:**
Claimant, Employer

# DECISION

The decision in the above-captioned case appears on the following page(s).

The decision is final unless appealed within 30 calendar days from the date of mailing shown below. See the attached "Notice to Parties" for further information on how to file an appeal. If you are entitled to benefits and have a question regarding the payment of benefits, call EDD at 1-800-300-5616.

**Harold V. Rucker**, Administrative Law Judge

JPOW CALIFORNIA, LLC
100 LENOX DR STE 100
LAWRENCEVILLE, NJ 08648

Date Mailed:

SEP 0 8 2022

**Case No.: 7231852**                    **San Diego Office of Appeals**
CLT/PET: Rachael M Medlin              ALJ: Harold V Rucker
Parties Appearing: Claimant, Employer
Parties Appearing by Written Statement: None

## ISSUE STATEMENT

The claimant appealed from a determination disqualifying the claimant for
unemployment benefits under Unemployment Insurance Code section 1256. A
ruling held the employer's reserve account was not subject to charges under
Unemployment Insurance Code sections 1030 and 1032. The issue in this case
is whether the claimant was discharged for misconduct connected with the most
recent work.

## FINDINGS OF FACT

The claimant last worked for the employer as a strategic program manager for 16
months at a final wage of $83,200 annually. Her last day of work was 12/10/21
at which time she was discharged from the work under the following
circumstances.

The employer discharged the claimant for using the employer's computer, email
and server to do her own business on the employer's time.

The employer admitted that the CEO was a 50% owner in the claimant's
business. The claimant had been given authorization to use the employer's
computers, emails and server to do work in her own business. The claimant said
all of her activities had been authorized by the CEO who was her boss.

## REASONS FOR DECISION

An individual is disqualified for benefits if he or she has been discharged for
misconduct connected with his or her most recent work. (Unemployment
Insurance Code, section 1256.)

The employer's reserve account may be relieved of benefit charges if the
claimant was discharged for misconduct. (Unemployment Insurance Code,
sections 1030 and 1032.)

"Misconduct connected with the work" is a substantial breach by the claimant of
an important duty or obligation owed the employer, wilful or wanton in character,
and tending to injure the employer. (Precedent Decision P-B-3, citing *Maywood
Glass Co. v. Stewart* (1959) 170 Cal.App.2d 719.)

An employee has an important duty to promptly provide advance notice to the employer if the employee will not appear at work as scheduled. (Precedent Decision P-B-510.)

The employer has the burden of proving misconduct. (*Prescod v. California Unemployment Insurance Appeals Board* (1976) 57 Cal.App.3d 29.)

In *Delgado v. California Unemployment Insurance Appeals Board* (1974) 41 Cal.App.3d 788, the claimant, a grocery checker, was discharged because she knowingly violated an employer rule when she postponed recording certain single purchases. The claimant believed her departures from the rule were acceptable to her immediate supervisor and the store manager, who knew of them and at times participated in them. The claimant was never warned to stop this practice. The Court of Appeals held that the claimant reasonably believed her actions were approved or condoned by her supervisor, and thus there was no misconduct.

In the instant matter the claimant had permission to use the employer's equipment and time to conduct her business. Because she had permission to do so, her conduct on the final incident did not amount to a substantial breach by the claimant of an important duty or obligation owed the employer. It is therefore concluded the claimant was discharged from the work for reasons other than misconduct.

## DECISION

The notice of determination and ruling are reversed. The claimant is qualified for benefits pursuant to section 1256 of the code. The employer's reserve account is subject to charges.

HR: 1/2

7231852-000000                    3



---

**Exhibit B**
**Revitalize Filed CA Statement of Information and**
**Malveaux & Co CA Statement of Information**



**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**LLC-12**

21-F59246

**FILED**

**IMPORTANT** — Read instructions **before completing this form.**

**Filing Fee – $20.00**

Copy Fees – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

In the office of the Secretary of State
of the State of California

OCT 26, 2021

**This Space For Office Use Only**

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.)

REVITALIZE GROUP LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 202129810715 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box 6347 Park Ridge Blvd | San Diego | CA | 92120 |
| b. Mailing Address of LLC, if different than Item 4a PO Box 420256 | San Diego | CA | 92142 |
| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box 6347 Park Ridge Blvd | San Diego | CA | 92120 |

**5. Manager(s) or Member(s)**

If no managers have been appointed or elected, provide the name and address of each member. At least one name and address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Rachael | Michelle | Medlin | |

| b. Entity Name - Do not complete Item 5a |
|---|
| |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 3838 Pendiente Court, #104 | San Diego | CA | 92124 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

INDIVIDUAL — Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Rachael | Michelle | Medlin | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 3838 Pendiente Court, #104 | San Diego | CA | 92124 |

CORPORATION — Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7. Type of Business**

| a. Describe the type of business or services of the Limited Liability Company |
|---|
| Professional Services Talent Recruitment |

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Rachael | Michelle | Medlin | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| PO Box 420256 | San Diego | CA | 92142 |

**9. The information contained herein, including any attachments, is true and correct.**

| 10/26/2021 | Rachael Michelle Medlin | CEO Co-Founder | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

LLC-12 (REV 01/2017)

Page 1 of 2

2017 California Secretary of State
www.sos.ca.gov/business/be

| **Attachment to**<br>**Statement of Information**<br>(Limited Liability Company) | **LLC-12A**<br>**Attachment** | 21-F59246 |
|---|---|---|

**A.   Limited Liability Company Name**

REVITALIZE GROUP LLC

This Space For Office Use Only

| **B.   12-Digit Secretary of State File Number** | **C.   State or Place of Organization** (only if formed outside of California) |
|---|---|
| 202129810715 | CALIFORNIA |

**D.   List of Additional Manager(s) or Member(s) -** If the manager/member is an individual, enter the individual's name and address.   If the manager/member is an entity, enter the entity's name and address.   Note:  The LLC cannot serve as its own manager or member.

| First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| Erica | | Beal | | |

| Entity Name |
|---|
| |

| Address | City (no abbreviations) | | State | Zip Code |
|---|---|---|---|---|
| 6347 Park Ridge Blvd | San Diego | | CA | 92120 |

| First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| | | | | |

| Entity Name |
|---|
| |

| Address | City (no abbreviations) | | State | Zip Code |
|---|---|---|---|---|
| | | | | |

| First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| | | | | |

| Entity Name |
|---|
| |

| Address | City (no abbreviations) | | State | Zip Code |
|---|---|---|---|---|
| | | | | |

| First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| | | | | |

| Entity Name |
|---|
| |

| Address | City (no abbreviations) | | State | Zip Code |
|---|---|---|---|---|
| | | | | |

| First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| | | | | |

| Entity Name |
|---|
| |

| Address | City (no abbreviations) | | State | Zip Code |
|---|---|---|---|---|
| | | | | |

| First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| | | | | |

| Entity Name |
|---|
| |

| Address | City (no abbreviations) | | State | Zip Code |
|---|---|---|---|---|
| | | | | |

| First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| | | | | |

| Entity Name |
|---|
| |

| Address | City (no abbreviations) | | State | Zip Code |
|---|---|---|---|---|
| | | | | |